# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 9, 2010

Lyle W. Cayce
Clerk

Nos. 05-70028 and 09-70018

FELIX ROCHA,

Petitioner – Appellant

v.

RICK THALER, Director, Texas Department of Criminal Justice,
Correctional Institutions Division,

Respondent – Appellee

Appeals from the United States District Court
for the Southern District of Texas

Before JOLLY, HIGGINBOTHAM, and HAYNES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Federal habeas petitioner Felix Rocha confessed to the murder of Rafael Fuentes—a security guard found shot to death outside the Houston nightclub where he worked—but later pled not guilty and proceeded to trial. Texas indictments charged both Rocha and a co-defendant, Virgilio Maldonado, with capital murder, though each defendant was tried separately. A jury convicted Rocha and on its answer to the sentencing questions he was sentenced to death. State courts affirmed the conviction and sentence on direct review. Over the

course of the next eight years, Rocha filed four state habeas applications and one federal habeas petition. All failed. The federal district court denied relief but held an evidentiary hearing and granted Rocha a certificate of appealability ("COA") on his claim under *Brady v. Maryland*, a claim we now examine. Before this court Rocha also renews his request for a COA on two additional questions: whether he is entitled to review on the merits of his punishment-phase ineffective assistance of counsel claim under *Wiggins v. Smith*; and whether the state violated an individually-enforceable right under the Vienna Convention by failing to inform Rocha that he was entitled, as a Mexican citizen, to contact his country's consulate. We affirm the district court, deny relief on Rocha's *Brady* claim, and deny Rocha's request for a COA on his claim under the Vienna Convention. We also hold that Rocha was not entitled to have a federal court review the merits of his *Wiggins* claim, but we grant his request for a COA on that question.

I

Rocha's federal petition is subject to the heightened standard of review set out in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). In the review of state proceedings, AEDPA proscribes federal habeas relief unless the state court's adjudication on the merits (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."[1] "A state court decision is 'contrary to . . . clearly established precedent if the state

---

[1] 28 U.S.C. § 2254(d).

court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases.'"[2]  "A state-court decision will also be contrary to . . . clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent."[3]  "A state-court decision involves an unreasonable application of [Supreme Court] precedent if the state court identifies the correct governing legal rule from [the] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case."[4]  AEDPA requires us to presume state-court findings of fact to be correct "unless the petitioner rebuts that presumption by clear and convincing evidence."[5]  We review the district court's findings of fact for clear error and its conclusions of law de novo, "applying the same standards to the state court's decision as did the district court."[6]

## II

After the state courts affirmed his conviction on direct and habeas review, Rocha learned that one of the officers who had testified at his trial, Jaime Escalante, had a disciplinary record and was romantically involved with the sister of the lone eyewitness, Reynaldo Muñoz.  Now on federal habeas, he says

---

[2] *Wallace v. Quarterman*, 516 F.3d 351, 354 (5th Cir. 2008) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)) (addition in *Wallace*).

[3] *Williams*, 529 U.S. at 406.

[4] *Id.* at 407.

[5] *Valdez v. Cockrell*, 274 F.3d 941, 947 (5th Cir. 2001) (citing 28 U.S.C. § 2254(e)(1)).

[6] *Harrison v. Quarterman*, 496 F.3d 419, 423 (5th Cir. 2007).

the state suppressed this information in violation of *Brady v. Maryland*.[7] Rocha claims he would have used the information to impeach the trial testimony of both Officer Escalante and eyewitness Muñoz. The district court, as we have noted, denied relief but granted a COA. We affirm the district court's denial of habeas relief because the information was immaterial to the jury's decision to convict.

## A

A successful *Brady* claim has three elements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."[8] Rocha procedurally defaulted on this claim by failing to present it in any of his four state habeas petitions so in federal court he must demonstrate "cause and prejudice" to qualify for habeas relief, unless failure to do so would result in a fundamental miscarriage of justice.[9] When a habeas petitioner brings a *Brady* claim, the "cause and prejudice" requirements of the procedural default doctrine parallel the last two elements of the alleged constitutional violation itself.[10] That is, a petitioner shows "cause" when the reason for his failure to develop facts in state-court proceedings was the state's suppression of the relevant evidence, while "prejudice" exists when the suppressed evidence is

---

[7] *See* 373 U.S. 83 (1963).

[8] *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

[9] *Id.* at 282.

[10] *Id.*

"material" for *Brady* purposes.[11]  On appeal, we assume without deciding both that the asserted evidence is at least nominally favorable to Rocha and that the state suppressed the evidence.  Our focus here is on materiality.

B

The parties do not dispute the relevant facts.  At Rocha's trial—again, conducted separately from co-defendant Maldonado's—eyewitness Muñoz testified that he was checking on some coin-operated pool tables he owned at the nightclub when he saw two men—one taller, and one shorter—approach Fuentes, the eventual victim.  The taller of the two men lifted his arms as if to permit a frisk.  According to Muñoz, the shorter man then pointed a gun at Fuentes before demanding and reaching for Fuentes's own holstered firearm.  Muñoz fled the scene without seeing what happened next. He did, however, hear two or three gunshots as he ran.  At Rocha's trial, Muñoz identified Maldonado as the taller man who had approached Fuentes the night of the murder.  Muñoz never pinned the murder on Rocha, saying only that his physical features "fit[] the description" of the shorter man.

But the state's case against Rocha did not rise and fall on eyewitness testimony—Rocha had confessed. The prosecution sought to lay a foundation for this confession through the testimony of Officer Escalante and a second police officer, Xavier Avila.  Escalante began by testifying that after the shooting he "made the scene" at the nightclub.  There he interviewed "five or six Spanish-speaking witnesses."  From then on he "[took] charge . . . of investigating leads and following up on things [he] learned during that initial visit."

Escalante's testimony continued: With no arrests made nearly a year and

---

[11] *Id.*

a half after the murder, police arrested Rocha and Maldonado on unrelated bank robbery and capital murder charges. Two days later, officers Escalante and Avila went to see Rocha and Maldonado in detention, suspecting that the attempted bank robbers also had something to do with the Fuentes murder. Their hunch seemed to bear fruit: Rocha made an uncounseled waiver of his *Miranda* rights with both officers present but requested that they come back the next day, at which time he would allow them to record his statement.

When the officers returned, they split up: Avila interviewed Rocha; Escalante took Maldonado. After about fifteen to thirty minutes, Maldonado confessed to the murder and implicated Rocha. This success in hand, Escalante interrupted Avila's interview with Rocha—which up to this point had been unproductive—to share the news. He presented an audio recording of Maldonado's confession and prompted Avila to use a particular segment as a tool to speed Rocha's interview along. Avila, working alone, resumed his questioning of Rocha, eventually making an audio recording of Rocha's full confession.[12] Escalante took no direct part in Rocha's interview.

Escalante's trial testimony then turned to his interactions with eyewitness

---

[12] On direct appeal, the Court of Criminal Appeals recounted Rocha's confession as follows:

> [Rocha] and Fuentes had been involved in an altercation at some time prior to the murder. Fuentes had beaten and otherwise embarrassed [Rocha], and [Rocha] had vowed to get revenge. On the night of the killing, [Rocha] and Maldonado confronted Fuentes. [Rocha] intended to take Fuentes's gun to embarrass him and show that Fuentes was not a good security guard. [Rocha] pulled his own gun on Fuentes, and Fuentes grabbed [Rocha]'s gun. Then [Rocha] and Fuentes struggled over [Rocha]'s gun, and [Rocha]'s gun was shot once during the struggle. [Rocha] did not know whether the shot hit Fuentes or simply went into the air. Maldonado shot Fuentes several times to protect [Rocha]. Maldonado then took Fuentes'[s] gun, and [Rocha] and Maldonado fled the scene.

*Rocha v. State*, 16 S.W.3d at 5.

Muñoz. He explained that he first met Muñoz during the investigation and that in November 1994 he showed Muñoz two photo spreads, neither depicting Maldonado or Rocha. Muñoz did not identify anyone on the two spreads, noting only that two photos "looked like" the taller man. Much later, in 1997, Escalante again showed Muñoz a series of photographs—this time with Maldonado's photograph included. Muñoz identified Maldonado as the taller of the two men who had approached Fuentes.

Officer Avila's trial testimony confirmed Escalante's account of their initial visit to Rocha. Avila testified in greater detail, answering questions regarding Rocha's mental state, physical well-being, and apparent ability to understand his waiver of *Miranda* rights. He then stepped the jury through his interrogation of Rocha.

On federal habeas review, the district court held an evidentiary hearing before rejecting Rocha's *Brady* claim; Muñoz, Escalante, and others were deposed. In his deposition, Escalante disclosed, for the first time, that he had freelanced for the owner of the nightclub—Maria Medeles—during the Fuentes investigation and that their relationship had turned romantic by the time of Rocha's trial. He testified that their professional relationship began sometime after the murder when Medeles hired him as an apparent jack-of-all-trades for her area businesses. Only later did the relationship blossom into something more. In seeming contrast to his trial testimony, Escalante also downplayed the level of his involvement in the Fuentes murder investigation, claiming, for example, that he did not recall taking part in the initial crime scene investigation at all. Rather, he said his involvement began when the detectives handling the case asked him, months after the murder, to contact eyewitness Muñoz through Medeles—Escalante's part-time employer and paramour—and, as it turns out, Muñoz's sister:

> What happened, Avila couldn't get ahold of him, and he told me, "Hey, tell Maria that we need to talk to her brother, show him a photo spread, and I said, 'Well, give me the photo spread so I can show it to him.' Maria tracked him down.

In his deposition, Escalante reiterated that he had first met Muñoz during the investigation and that he had seen Muñoz only "three or four times." Escalante said he could not "stand" Muñoz and that Medeles and Muñoz were not close, emphasizing that the siblings were related by adoption only. Consistent with testimony adduced at trial, Escalante confirmed that he had not been present for Rocha's confession but had provided Avila with the audio recording of Maldonado's statement. In his federal petition, Rocha concedes "Escalante is vague on when his relationship with Medeles began" but asserts that at a minimum Escalante "knew Medeles well enough in 1994 to use her to find her brother . . . during the investigation."

Escalante also admitted that he had been disciplined for running two background checks on Medeles and three on her son at their request, and that he had retrieved the case number for a case involving the theft of items from Medeles's car. In response to these actions, the department suspended him for six days in 2001 for unauthorized usage of police computer systems. It is not entirely clear when the department's investigation began, but Escalante first gave a statement on the subject in September 1999—after Rocha's November 1998 trial.

Adding to this milieu, Rocha rests his *Brady* claim in part on the deposition testimony of Andres Reza, a former police officer who is currently serving a prison sentence on an unrelated conviction for kidnapping Medeles and holding her for ransom. Based on Reza's testimony, Rocha claims that the police department's internal affairs division had long investigated Escalante's activities

and that the prosecution failed to disclose evidence of the following: (1) Escalante's suspected involvement in the murder of a Colombian victim; (2) his suspected involvement in the drug trade; (3) a DEA investigation into his alleged drug activities; (4) his suspected use of local cantinas in distributing drugs; (5) his suspected involvement with a Colombian drug-trafficking network; and (6) his suspected involvement in underage prostitution at the cantinas. Notably, Rocha provides no corroboration for these allegations. Nor does he assign dates to any of the alleged incidents or investigations, explaining only that Escalante's disciplinary history spanned 13 years and included seven sustained complaints. For its part, the state identifies three internal department misconduct complaints filed prior to Rocha's trial, but the record admits no further detail.

## C

"Unless suppressed evidence is 'material for *Brady* purposes, [its] suppression [does] not give rise to sufficient prejudice to overcome [a] procedural default.'"[13] "[T]he materiality standard for *Brady* claims is met when 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"[14] Where, as here, there are a number of potential *Brady* violations, "a court must analyze whether the cumulative effect of all such evidence suppressed by the government raises a reasonable probability that its disclosure would have produced a different result."[15]

---

[13] *Banks v. Dretke*, 540 U.S. 668, 698 (2004) (quoting *Strickler*, 527 U.S. at 282) (alterations in *Banks*).

[14] *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

[15] *See United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004); *see also Kyles*, 514 U.S. at 434.

"The materiality of Brady material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state."[16] Undisclosed evidence that is merely cumulative of other evidence is not material, while the impeached testimony of a witness whose account is "strongly corroborated by additional evidence supporting a guilty verdict . . . generally is not found to be material" either.[17] Conversely, a *Brady* violation is more likely to occur when the impeaching evidence "would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration."[18]

The record, read liberally in Rocha's favor, indicates that Escalante had a professional and romantic relationship with Medeles by the time of Rocha's trial; that because of this relationship Escalante at least knew of Medeles's brother, eyewitness Muñoz; that Escalante saw Muñoz three or four times over the course of the subsequent investigation; and that his relationship with Muñoz was neither close nor particularly amicable. It is also undisputed that Escalante was the subject of three sustained misconduct complaints prior to Rocha's trial.

Rocha contends that the state's failure to disclose this alleged impeachment evidence tainted the testimony of both Escalante and Muñoz. We cannot say that he is entirely wrong—Escalante's credibility, for one, is strained to say the least. Yet, even if the undisclosed evidence tends to impeach all of Escalante's testimony, that testimony was merely duplicative of Officer Avila's.

---

[16] *Sipe*, 388 F.3d at 478 (quoting *Smith v. Black*, 904 F.2d 950, 967 (5th Cir.1990)) (internal quotation marks omitted).

[17] *Id.* (quoting *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996); *Wilson v. Whitley*, 28 F.3d 433, 439 (5th Cir. 1994)) (quotation marks omitted).

[18] *Id.* (quoting *United States v. Weintraub*, 871 F.2d 1257, 1262 (5th Cir. 1989)) (internal quotation marks omitted).

While Escalante went beyond Avila in stating he had "made the scene" at the nightclub where the murder took place, "interviewed five or six Spanish-speaking witnesses at the scene," and witnessed Muñoz's initial identification of Maldonado as the "taller man," the prosecution primarily relied on Escalante to lay a foundation for Rocha's confession. On that score, it was Avila—not Escalante—who provided the meaningful detail about Rocha's confession; he was the one, after all, who actually questioned Rocha. The remainder of Escalante's testimony was largely irrelevant to the state's case. And at any rate Rocha does not now contend that his full confession was anything but knowing and voluntary, so neither officer's testimony is particularly relevant in demonstrating Rocha's guilt.

Muñoz's testimony also withstands Rocha's scrutiny, especially given the minimal impeachment value of the Escalante-Medeles-Muñoz triangle. Escalante romanced Medeles; Escalante found Muñoz through Medeles a few years after the murder; Escalante presented a series of photographs and Muñoz identified Maldonado, Rocha's co-defendant; and Muñoz later attested to that identification, adding only that Rocha "fit[] the description" of the short man present moments before Fuentes's murder. Without more, this narrative—while no doubt curious—is not compelling impeachment. As the district court reasoned, "Muñoz'[s] relationship to Medeles does not establish that Muñoz had any motive to lie about Rocha or anything else in this case. . . . [or] had any reason to frame Rocha or otherwise lie about who committed the murder."

A motive to lie or to frame is particularly difficult to fathom in light of the actual substance of Muñoz's testimony, which reached Rocha's guilt tangentially at most. Muñoz merely related that Rocha resembled the shorter man seen at the nightclub the night of Fuentes's murder, and the balance of his testimony—like Escalante's account—was only useful to the prosecution in

11

corroborating the underlying facts of Rocha's full confession. That confession remains in evidence uncontested, strongly corroborating Muñoz's supporting testimony and rendering it largely superfluous.

Viewed as a whole, the "transcript falls far short of undermining confidence in the guilt phase's outcome,"[19] and the undisclosed evidence is thus immaterial for *Brady* purposes.

### III

Rocha also requests a COA to address two additional issues, first, a punishment-phase ineffective assistance of counsel claim, and second, a charge that the state violated his rights under the Vienna Convention. The district court rejected his request in full.

Under AEDPA, a COA—which is a necessary predicate to our full review—may issue only if the habeas petitioner "has made a substantial showing of the denial of a constitutional right."[20] We will grant a COA only when "reasonable jurists could debate whether (or, for that matter, agree that)" the court below should have resolved the claims in a different manner or that this court should encourage the petitioner to further litigate his claims in federal court.[21] This "requires an overview of the claims in the habeas petition and a general assessment of their merits" but not "full consideration of the factual or legal bases adduced in support of the claims."[22]

---

[19] *Miller-El v. Cockrell*, 537 U.S. 322, 349 (2003) (quoting 28 U.S.C. § 2253(c)(2)) (internal quotation marks omitted).

[20] 28 U.S.C. § 2253(c)(2); *Miller-El*, 537 U.S. at 335–36.

[21] *Id.* at 336 (quoting *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000)).

[22] *Id.*

A

i

Rocha first raised the claim that his trial counsel was constitutionally ineffective at sentencing by failing to investigate, develop, and present mitigation evidence—his claim under *Wiggins v. Smith*—in the district court as part of his federal habeas petition.[23]  The court noted that Rocha did not raise this claim in state court, making the claim unexhausted. Ordinarily, the district court observed, "a federal habeas petition that contains unexhausted claims is dismissed without prejudice, allowing the petitioner to return to the state forum to present his unexhausted claims."  However, "if the court to which a petitioner must present his claims to satisfy the exhaustion requirement would now find the claims procedurally barred," the court need not dismiss his claims to allow exhaustion.  The district court concluded that Rocha's *Wiggins* claim would be procedurally barred in Texas court, and that Rocha was unable to show cause for or prejudice from a procedural default or that he was actually innocent of capital murder or the death penalty.  Accordingly, the district court held that Rocha's *Wiggins* claim was procedurally barred from review in federal court and denied him habeas relief.[24]

With his appeal pending before our court, Rocha filed a subsequent state habeas application to exhaust his *Wiggins* claim.  Rocha also moved for—and obtained—a stay of the federal appellate proceedings until the Texas Court of

---

[23] *See* 539 U.S. 510 (2003).  As part of his initial habeas petition, Rocha also asserted that his trial counsel was ineffective for failing to discover and use impeachment evidence concerning Escalante and Muñoz.  He has since abandoned this claim.

[24] After the district court denied his federal habeas petition and before Rocha filed his notice of appeal, Rocha filed a motion to alter or amend the district court's judgment on his *Brady* claim and a motion for a COA on his Vienna Convention claim.  At that time, Rocha did not file a motion for post-judgment relief on his *Wiggins* claim.

Criminal Appeals ("CCA") ruled on Rocha's *Wiggins* claim. The CCA eventually dismissed Rocha's claim, after briefly reciting the procedural history, in an unsigned per curiam order:

> We have reviewed the application and find that the allegations do not satisfy the requirements of Article 11.071, Section 5(a)(3). Therefore, we dismiss this application as an abuse of the writ.[25]

Rocha then returned to federal district court and filed a motion to reopen the district court's final judgment under Federal Rule of Civil Procedure 60(b) for further evaluation of his *Wiggins* claim. Rocha asserted that the CCA had reached the merits of his *Wiggins* claim, thus permitting federal habeas review. Rocha also moved for another stay and limited remand in the Fifth Circuit to allow the district court to consider Rocha's Rule 60(b) motion. While Rocha's motion to stay the proceedings and for limited remand was pending, the district court denied Rocha's motion for Rule 60(b) relief and denied Rocha's application for a COA. The district court denied Rocha's Rule 60(b) motion for relief from judgment because it concluded that the CCA's reliance on § 5(a)(3) was an independent and adequate state ground, leaving intact its original conclusion that Rocha's *Wiggins* claim was procedurally barred.

Rocha appealed the district court's denial of his Rule 60(b) motion to this court.[26] We denied as moot Rocha's motion to stay the proceedings and for

---

[25] *See* TEX. CODE CRIM. PROC. ANN. art. 11.071, § 5(a)(3) (Vernon 2010).

[26] This appeal was docketed as number 09-70018. We have jurisdiction to consider the denial of a Rule 60(b) motion in a habeas proceeding only if the motion "attacks, not the substance of the federal court's resolution of the claim on the merits, but some defect in the integrity of the federal habeas proceedings." *Gonzales v. Crosby*, 545 U.S. 524, 532 (2005). Where the Rule 60(b) motion contains a new claim, it is properly considered a successive habeas petition and is subject to AEDPA's "requirement that a successive habeas petition be precertified by the court of appeals as falling within an exception to the successive-petition bar." *Id.* (citing 28 U.S.C. § 2244(b)(3)). The parties agree that Rocha's Rule 60(b) motion was not an improper successive petition, which is in accord with the law of this circuit. *Ruiz v.*

limited remand, and consolidated Rocha's appeal of the denial of his Rule 60(b) motion with Rocha's appeal of the denial of his habeas petition.[27]

Rule 60(b)(6) authorizes relief from a final judgment, order, or proceeding for "any other reason that justifies relief."[28]  We have interpreted Rule 60(b)(6)'s "any other reason" language to mean any other reason than those contained in the preceding five enumerated grounds of Rule 60(b).[29]  While Rule 60(b)(6) is commonly referred to as a "grand reservoir of equitable power to do justice," the rule is only invoked in "extraordinary circumstances."[30]  Indeed, this court has repeatedly stated that "the decision to grant or deny relief under Rule 60(b) lies within the sound discretion of the district court and will be reversed only for an

---

*Quarterman*, 504 F.3d 523, 526 (5th Cir. 2007) (holding that AEDPA's limitation on successive federal habeas petitions does not apply where the district court previously denied relief based on procedural default and failure to exhaust and the petitioner is using Rule 60(b) to seek a merits determination).  We thus have jurisdiction to review the district court's denial of Rocha's Rule 60(b) motion.

[27] The original appeal was docketed as number 05-70028.

[28] FED. R. CIV. P. 60(b)(6).  In his briefing before this court, Rocha fails to state which subset of Rule 60(b) authorizes relief from the district court's judgment.  In his briefing before the district court, Rocha asserted that he was entitled to relief under both Rule 60(b)(5) and (6).  Rule 60(b)(5) vests a court with the authority to grant relief from a final judgment, order, or proceeding if "the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable."  FED. R. CIV. P. 60(b)(5). The district court's judgment has not been satisfied, released, or discharged; nor was the district court's decision based on an earlier judgment of the Texas Court of Criminal Appeals since that judgment had not yet been issued at the time of the district court's decision.  Accordingly, Rocha's claim for relief under Rule 60(b) is properly analyzed under subsection (6). *See Bailey v. Ryan Stevedoring Co., Inc.*, 894 F.2d 157, 159 (5th Cir. 1990) ("It should be noted that while 60(b)(5) authorizes relief when a judgment upon which it was based has been reversed or otherwise vacated, it does not authorize relief from a judgment on the ground that the law applied by the court in making its adjudication has been subsequently overruled or declared erroneous in another and unrelated proceeding.") (quoting *Lubben v. Selective Sys. Local Bd. No. 27.*, 453 F.2d 645, 650 (1st Cir. 1972)).

[29] *Batts v. Tow-Motor Forklift Co.*, 66 F.3d 743, 747 (5th Cir. 1995).

[30] *Williams v. Thaler*, 602 F.3d 291, 311 (5th Cir. 2010).

abuse of that discretion."[31]

## ii

A federal court is precluded from considering a state prisoner's habeas petition if the underlying state decision rests on an adequate and independent state ground, such as a state procedural bar.[32] We must presume "that there is no independent and adequate state ground for a state court decision when the decision fairly appears to rest primarily on federal law, or to be interwoven with federal law."[33] A state court may overcome this presumption by "stating clearly and expressly that its decision is based on bona fide separate, adequate, and independent grounds."[34] Otherwise, a federal court "will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so."[35] Rocha asserted before the district court—and re-asserts on appeal—that the CCA's dismissal of his application did not unambiguously rest on an independent state ground, and that the federal court accordingly erred by not reviewing the merits of his *Wiggins* claim.[36]

---

[31] *Id.* at 312 (internal quotations, brackets, and citations omitted); *see also Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 402 (5th Cir. Unit A 1981) ("It is not enough that the granting of relief might have been permissible, or even warranted[—]denial must have been so unwarranted as to constitute an abuse of discretion.").

[32] *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Whether a particular state-law rule is "independent" of federal law is a federal question. *Lee v. Kemna*, 534 U.S. 362, 375 (2002).

[33] *Coleman*, 501 U.S. at 735.

[34] *Id.* at 733 (internal quotations, brackets, ellipses, and citations omitted).

[35] *Michigan v. Long*, 463 U.S. 1032, 1040–41 (1983).

[36] The "adequacy" of a state ground, which Rocha does not contest here, turns on whether the state law ground is both "firmly established and regularly followed" by the state

In 1995, § 5(a) of Article 11.071 of the Texas Code of Criminal Procedure, on which the CCA's dismissal relied, canonized Texas's abuse of writ doctrine. The provision governs whether Texas state courts have the authority to consider new claims raised in a subsequent application for writ of habeas corpus in a death-penalty case. Once a habeas applicant has filed an initial habeas application in state court, "a court may not consider the merits of or grant relief based on [any new claims brought in a] subsequent application unless the application contains sufficient specific facts establishing that":

> (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;
>
> (2) by a preponderance of the evidence, but for a violation of the United States Constitution, no rational juror could have found the applicant guilty beyond a reasonable doubt; or
>
> (3) by clear and convincing evidence, but for a violation

---

courts. *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991) (internal quotation marks and citations omitted); *see also Hughes v. Quarterman*, 530 F.3d 336, 341 (5th Cir. 2008). The Supreme Court recently held that a state discretionary procedural rule is not *automatically* inadequate to bar federal court review on habeas. *Beard v. Kindler*, 130 S. Ct. 612, 619, ___ U.S. ___, ___ (2009). The state pointed to *Beard* in a December 2009 Rule 28(j) letter. Although Rocha's brief at times appears to contest both the independent and adequate nature of § 5, his response to the state's Rule 28(j) letter clearly disavows any claim that § 5 is inadequate: "Mr. Rocha has argued in his application for a Certificate of Appealability that he is entitled to federal review because the Texas Court of Criminal Appeals' . . . decision did not rest on an independent state ground. He has not made any argument that discretion in the [CCA's] judgment renders it inadequate and requires federal review. Rather, Mr. Rocha has argued that the [CCA's] decision disposing of Mr. Rocha's subsequent habeas application is not independent because: (1) the dismissal rests on a ground (specifically, Tex. Code of Crim. Proc. 5(a)(3)) that is interwoven with federal law, and (2) the decision did not clearly and expressly rely on state law."

17

of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071, 37.0711, or 37.072.[37]

Rocha invokes—and the CCA's dismissal specifically relied on—§ 5(a)(3), which, as paraphrased by the CCA, permits a subsequent state habeas applicant like Rocha to proceed with his claim "if he can show to the requisite level of confidence that no rational juror 'would' have answered at least one of the statutory special punishment issues"—which determine whether capital punishment will be imposed—"in the State's favor."[38] The Texas legislature "has determined, however, that the State's interest in the finality of its judgments justifies the imposition of higher burdens upon the subsequent applicant who did not avail himself of the opportunity and resources available to him . . . in an initial writ to raise his claim."[39] For an applicant who bypassed the opportunity to raise a claim in an initial writ, the "requisite level of confidence" is clear and convincing evidence.[40]

The state of Texas undisputedly has the right to establish the conditions under which it will entertain a subsequent writ. And we have long held that those conditions as enumerated in § 5(a) "normally constitute[] an adequate and independent procedural bar to federal review,"[41] with at least two notable

---

[37] TEX. CODE. CRIM. PROC. ANN. art. 11.071 § 5(a) (West 2010).

[38] *Ex parte Blue*, 230 S.W.3d 151, 161 (Tex. Crim App. 2007).

[39] *Id.* at 162.

[40] *Id.*

[41] *See Morris v. Dretke*, 413 F.3d 484, 500 (5th Cir. 2005) (Higginbotham, J., concurring); *see also Aguilar v. Dretke*, 428 F.3d 526, 533 (5th Cir. 2005) ("This court has consistently held that Texas'[s] abuse-of-writ rule is ordinarily an 'adequate and independent' procedural ground on which to base a procedural default ruling.").

exceptions.[42]

A federal petitioner at the same time may avoid a state-law procedural bar if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."[43]  The "miscarriage of justice" exception applies where a petitioner is "actually innocent" of either the offense giving rise to his conviction or "actually innocent" of the death penalty.[44] Under the Supreme Court's decision in *Sawyer v. Whitley*, a petitioner who claims to be actually innocent of the death penalty to which he has been sentenced "must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law."[45]  Actual innocence is "not itself a constitutional claim, but instead a gateway through which a habeas

---

[42] *See Rivera v. Quarterman*, 505 F.3d 349 (5th Cir. 2007); *Ruiz v. Quarterman*, 504 F.3d 523 (5th Cir. 2007).  *Rivera* involved a denial under § 5(a)(1), as indicated in the CCA's articulation of the applicable standard in that case: "an applicant must allege 'sufficient specific facts' to support his entitlement to bring a claim under newly established law within that writ application." *Ex parte Rivera*, 2003 WL 21752841, at *1.  *Ruiz* also considered a denial under § 5(a)(1).  The CCA denied the habeas application under § 5, Ruiz argued § 5(a)(1) to this court, and we based our analysis on that argument: "The Texas Code of Criminal Procedure, as interpreted by the CCA, provides for subsequent applications where (1) the factual or legal basis for the subsequent claim was previously unavailable and (2) where the facts alleged would constitute a federal constitutional violation that would likely require relief from either the conviction or sentence." *Ruiz*, 504 F.3d at 527.  Appended to this assertion was a citation to *Ex parte Campbell*, a CCA decision discussing § 5(a)(1), finding that the habeas applicant had "facially surmounted the 'unavailability' hurdle of Section 5(a)(1)," and asking whether he had put forth a "prima facie" showing of a constitutional violation.  226 S.W.3d 418, 421–22 (Tex. Crim. App. 2007).

[43] *Hughes*, 530 F.3d at 341 (quoting *Coleman*, 501 U.S. at 750).

[44] *See Schlup v. Delo*, 513 U.S. 298, 326–27; *Sawyer v. Whitley*, 505 U.S. 333, 338 (1992); *see also Williams*, 602 F.3d at 307.

[45] 505 U.S. at 336.

petitioner must pass to have his otherwise barred constitutional claim considered on the merits."[46]

Texas largely adopted this federal gateway in crafting its own conditions for subsequent habeas applications. As the CCA has explained, "[t]he [Texas] Legislature quite obviously intended [§ 5(a)(3)], at least in some measure, to mimic the federal doctrine of 'fundamental miscarriage of justice.' . . . apparently intending to codify, more or less, the [actual-innocence-of-the-death-penalty] doctrine found in *Sawyer v. Whitley*."[47] The practical result in nearly all cases will be that the federal and state standards are identical.[48]

Texas is not alone in providing exceptions to habeas procedural bars under heightened pleading standards; as the Third Circuit recently recognized, "[m]any states have procedural default rules with similar 'safety valves' for situations in which enforcing the procedural default would work a serious injustice."[49] These rules typically invoke "plain error" review of alleged constitutional violations,[50] or pleading requirements to weed out "facially implausible" or "frivolous" claims, in order to mitigate the effects of procedural default.[51] The circuits are split on whether these exceptions negate an otherwise independent state-law ground.

---

[46] *See Schlup*, 513 U.S. at 315 (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)) (internal quotation marks omitted).

[47] *Ex parte Blue*, 230 S.W.3d at 159–60; *see also Hughes*, 526 F.3d at 196 ("[T]he Texas Court of Criminal Appeals has also construed section 5(a)(3) as analogous to the federal "actual innocence" exception to exhaustion.").

[48] *Compare Sawyer*, 505 U.S. at 336, *with* TEX. CODE. CRIM. PROC. ANN. art. 11.071 § 5(a) (West 2010).

[49] *Campbell v. Burris*, 515 F.3d 172, 178 (3d Cir. 2008) (collecting cases).

[50] *Id.*

[51] *Gardner v. Galetka*, 568 F.3d 862, 884 (10th Cir. 2009).

The First,[52] Third,[53] Fourth,[54] Sixth,[55] Seventh,[56] Tenth,[57] and Eleventh[58] Circuits

---

[52] *Lynch v. Ficco*, 438 F.3d 35 (1st Cir. 2006) ("The [state court], expressly noting that the instruction 'was not objected to at trial,' reviewed Lynch's jury instructions claim for 'a substantial likelihood of a miscarriage of justice.' Limited review of this sort does not work a waiver of the contemporaneous objection requirement.") (internal citations and some quotation marks omitted).

[53] *Campbell*, 515 F.3d at 178 ("Many states have procedural default rules with similar 'safety valves' for situations in which enforcing the procedural default would work a serious injustice. As a result, while the United States Supreme Court has not definitively resolved the matter, there is ample court of appeals case law on whether invocation of similar 'plain error' review of alleged violations of the federal constitution in order to mitigate the effect of a state procedural default rule will suffice to deprive a state court ruling of its 'independent' character. We agree with our sister Courts of Appeals for the First, Fourth, Sixth, Seventh, Tenth and Eleventh Circuits that it does not.").

[54] *Daniels v. Lee*, 316 F.3d 477, 487 (4th Cir. 2003) (holding that a federal court is procedurally barred from considering claim where state court's review was limited to determining, under the plain error doctrine, whether an error "so infected the trial with unfairness as to make the resulting conviction a denial of due process").

[55] *Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 423 (6th Cir. 2003) ('The [state court of appeals] did not conduct the sort of review of the jury instructions that presumably would have been undertaken had there been a timely objection to them; instead, the court inquired only whether affirmance of the conviction would 'result in manifest injustice' because of the alleged instructional error . . . . We would be loath to adopt an exception to the 'cause and prejudice' rule that would discourage state appellate courts from undertaking the sort of inquiry conducted by the [state] court, and we do not believe that the state court's explanation of why the jury instructions resulted in no manifest injustice can fairly be said to have constituted a waiver of the procedural default.").

[56] *Rodriguez v. McAdory*, 318 F.3d 733, 736 (7th Cir. 2003) ("Although a state court's review of whether an error is plain often entails at least limited review of the merits, that limited review is at most 'entangled' with the merits and certainly not 'entirely dependent on the merits.' Thus the state court's plain error review of Mr. Rodriguez's claims did not undo his procedural default.") (internal quotation marks and citation omitted).

[57] *See Gardner*, 568 F.3d at 884 (stating in dicta that a federal court is procedurally barred when state courts ask whether a constitutional claim was "facially implausible" or "frivolous" because the "frivolousness inquiry is not the bar; it is an element of the exception to the bar").

[58] *Julius v. Johnson*, 840 F.2d 1533, 1546 (11th Cir. 1988) ("[T]he mere existence of a 'plain error' rule does not preclude a finding of procedural default.").

hold that such exceptions do not ordinarily deprive state court rulings of their "independent" character. The Ninth Circuit disagrees,[59] the Eighth has reached inconsistent results,[60] and the Supreme Court's teachings are inconclusive.[61] But we need not enter this fray because the identity of state and federal law in this case has rendered meaningless any search for an independent and adequate ground.

Either  § 5(a)(3) operates as an independent state ground, in which case federal law permits merits review only if the petitioner demonstrates cause and prejudice or actual innocence of the death penalty, or the provision is not independent of federal law, and we apply the actual-innocence-of-the-death-penalty standard because state law—§ 5(a)(3) itself—demands that of us.  In both cases, Rocha must clear the identical hurdle before we can reach the merits of his *Wiggins* claim.  Texas may exercise its prerogative to establish heightened

---

[59] *See Walker v. Endell*, 850 F.2d 470, 474–75 (9th Cir. 1987) ("[A] state appellate court reviewing for plain error reaches the merits of a petitioner's claim . . . . In reaching its conclusion that there was no plain error, the [state] court conducted a review on the merits . . . effectively lift[ing] the state's procedural bar to [federal] review.").

[60] *Compare Toney v. Gammon*, 79 F.3d 693, 699 (8th Cir. 1996) ("[A] properly limited plain error review by a state court does not cure a procedural default."), *with Hornbuckle v. Groose*, 106 F.3d 253, 257 (8th Cir. 1997) (holding that when a state conducts a plain error review, the federal court may also review for plain error).

[61] In *Osborne v. Ohio*, a direct review case, the Supreme Court considered the Ohio Supreme Court's ruling that, although the trial judge failed to charge the jury that scienter was an element of the petitioner's crime, the petitioner had waived the issue by failing to object at trial and the omissions did not "amount[] to plain error."   495 U.S. 103, 107–08 (1990). Without reciting Ohio's plain error analysis, the Court had "no difficulty agreeing with the State that Osborne's counsel's failure to urge that the court instruct the jury on scienter constitutes an independent and adequate state-law ground preventing us from reaching Osborne's due process contention on that point." *Id.* at 123.  Furthermore, on direct review and in the non-death penalty context, the Supreme Court has suggested that where a state court does not actually reach the underlying merits, the independence of the state procedural rule is not automatically undermined by the mere existence of provisions requiring or empowering the state court to excuse procedural defaults if the underlying error is "plain" or "fundamental." *See Sochor v. Florida*, 504 U.S. 527, 534 n.*.

barriers to subsequent state habeas applications, and the federal courts are obliged to faithfully apply those barriers in federal habeas proceedings as well.[62] "[N]othing in [the CCA's] perfunctory dismissal of the claims . . . suggests that it" went behind *Sawyer* and "actually considered or ruled on the merits."[63]  It signifies that whether § 5(a)(3) is characterized as a federally-mandated exception to a state procedural bar or as an exception derived from federal caselaw yet circumscribed by state statute, the threshold review is for actual innocence of the death penalty.[64]

---

[62] *See Haynes v. Quarterman*, 526 F.3d 189, 196–97 (5th Cir. 2008) (applying § 5(a)(3)'s "actual innocence of the death penalty" standard to determine whether Texas courts would grant a federal habeas petitioner the opportunity to pursue a successive habeas petition despite failing to assert his claims in a previous petition)*, rev'd on other grounds sub nom. Thaler v. Haynes*, 130 S. Ct. 1171 (2010) ; *see also Williams*, 602 F.3d at 307–08 (applying § 5(a)(2)'s "actual innocence" standard to decide whether a federal habeas petitioner's new evidence demonstrated that "but for a violation of the United States Constitution no rational juror could have found [him] guilty beyond a reasonable doubt");  *Hornbuckle*, 106 F.3d at 257 (8th Cir. 1997) (holding that when a state conducts a plain error review for "manifest injustice," the federal court may review the habeas petitioner's claim under the same standard); *Jones v. Jerrison*, 20 F.3d 849, 854 (8th Cir. 1994) ("Because the state courts reviewed Jones's claim under a plain-error standard, we also apply a plain-error standard on habeas review, not a more stringent standard.") (citation omitted); *Roy v. Coxon*, 907 F.2d 385, 390 (2d Cir. 1990) ("The implication of *Osborne* [*v. Ohio*], therefore, appears to be that even if the state court has addressed the questions of (a) whether there was error, and (b) whether the error was prejudicial, if these questions were answered in the context of plain-error analysis, the decision was not sufficiently a ruling on the merits to authorize the federal court to reach the merits."); *cf. Osborne*, 495 U.S. at 123.

[63] *See Hughes*, 530 F.3d at 342.

[64] In *Balentine v. Thaler*, 609 F.3d 729 (5th Cir. 2010), a panel of this Court held that the CCA reached the merits of a petition for habeas corpus when it dismissed the petition under Article 11.071 § 5.  *Balentine* first relied on *Ruiz* to conclude that a bare citation to § 5 is not a clear and express statement that the decision rests on an independent and adequate state-law ground.  *See id.* at 735-38.  It then proceeded to consider the merits of the underlying claim.  *See id.* at 738-43.  To the extent that our decision today is not fully consonant with the decision in *Balentine*, we believe that dissonance stems from *Balentine*'s misapplication of our decision in *Ruiz*.  The mandate has yet to issue in *Balentine*, and a petition for rehearing en banc remains pending.  We therefore instruct the clerk of the court that the mandate in this case shall not issue until the mandate has issued in *Balentine*.

Here, Rocha cannot make the requisite showing under this shared standard. When a claim of actual innocence contests a sentence of death, the habeas petitioner's claim must tend to negate not just the jury's *discretion* to impose a death sentence but the petitioner's very *eligibility* for that punishment. That is, a habeas petitioner who is "unquestionably eligible" for the sentence received can never be "actually innocent of the death penalty."[65] This is so because late-arriving constitutional error that impacted only a jury's sentencing discretion is not "sufficiently fundamental as to excuse the failure to raise it timely in prior state and federal proceedings."[66] "[T]he 'actual innocence' requirement must," then, "focus on those elements that render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error."[67]

But that is just the sort of evidence Rocha presents here. His *Wiggins* claim reduces to an assertion that mitigating evidence could have influenced the jury's discretion in considering a sentence of death; he does not argue that this evidence would have rendered him *ineligible* for the death penalty. A *Wiggins* claim by its operation in this case goes only to a jury's discretion in meting out the penalty of death, not a particular defendant's eligibility for that punishment.[68]

That said, a caveat is necessary. Although the state actual innocence standard as a general rule coincides with the federal standard, uncertainty

---

[65] *Ex parte Blue*, 230 S.W.3d at 160 (citing *Sawyer*, 505 U.S. at 343–48).

[66] *Id.* (citing *Sawyer*, 505 U.S. at 343–48).

[67] *Sawyer*, 505 U.S. at 347; *Ex parte Blue*, 230 S.W.3d at 161 ("This reading of the [§ 5(a)(3)] exception seems to limit its applicability to constitutional errors that affect the applicant's *eligibility* for the death penalty *under state statutory law*.") (emphasis in original).

[68] *See Haynes*, 526 F.3d at 197; *Ex parte Blue*, 230 S.W.3d at 160.

exists because the CCA speculated in *Ex parte Blue* that it might "permit a subsequent state habeas applicant to proceed under circumstances that would not excuse a federal petitioner under *Sawyer v. Whitley*," specifically circumstances where the applicant faults his counsel's failure to develop and present mitigation evidence at sentencing.[69] Thus, Rocha's *Wiggins* claim—the constitutional vehicle for complaints of inadequate mitigation at sentencing—might very well "meet the criteria" of § 5(a)(3) as a matter of state law.[70]

But in the face of this state-law uncertainty, the CCA in Rocha's case was silent, dismissing his subsequent application with a bare citation to § 5(a)(3). From this silence we cannot discern whether the CCA resolved the question left open in *Ex parte Blue*, concluded that the state version of actual innocence does in fact permit mitigation evidence to form the basis of such a claim, and then

---

[69] *See Ex parte Blue*, 230 S.W.3d at 161 n.42 ("Since 1991, one of the special issues that determine whether capital punishment will be imposed is the so-called 'mitigation' special issue, embodied in Article 37.071, Section 2(e). Article 11.071 was originally promulgated in 1995, after this amendment to Article 37.071. Therefore it is arguable that, in theory at least, a subsequent habeas applicant could demonstrate by clear and convincing evidence that, but for some constitutional error, no rational juror would have answered the mitigation special issue in the State's favor."); *see also* TEX. CODE CRIM. PROC. ANN. art. §37.071 (West 2010) ("(2)(b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury: (1) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and (2) in cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken. . . . (e)(1) The court shall instruct the jury that if the jury returns an affirmative finding to each issue submitted under Subsection (b), it shall answer the following issue: Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.").

[70] *Ex parte Blue*, 230 S.W.3d at 161 n.42.

determined on the facts of this case that Rocha had nevertheless failed the standard, or whether the court simply reverted to the federal standard. Putting aside the low probability that any court would resolve sub rosa an issue it had very recently and explicitly left unanswered, we must at any rate conclude that the CCA relied on federal law in making its decision. Hitched to the Supreme Court's teachings in *Sawyer*, bare citation to § 5(a)(3)—without more—"fairly appears to rest primarily on federal law, or to be interwoven with federal law,"[71] namely the federal actual innocence standard, and there is no clear and express basis to say otherwise.[72] Accordingly, we must "accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so."[73] And federal law under *Sawyer* precludes Rocha's *Wiggins* claim.

Seen generally, the district court's conclusion—that Rocha's *Wiggins* claim is of no help to him given the procedural posture of his case and the contours of state law—was correct. However, given *Balentine* and its newly minted reading, reasonable jurists could debate whether Rocha's *Wiggins* claim fails because § 5(a)(3) operates as an independent and adequate state ground and Rocha cannot make the showing of actual innocence of the death penalty that is required to overcome a state-law procedural bar, or his *Wiggins* claim fails because his claim of actual innocence under § 5(a)(3) fails on the merits. Therefore, a COA will issue on this question. As for our broader conclusion, whether state court invocation of § 5(a) of Article 11.071 of the Texas Code of Criminal Procedure or its parts clearly rests a decision upon independent state

---

[71] *Coleman*, 501 U.S. at 735.

[72] *Id.* at 733 (internal quotations, brackets, ellipses, and citations omitted).

[73] *Long*, 463 U.S. at 1040–41.

grounds does not yield to a universal answer. Rather, the answer will often turn on contextual and case specific inquiries laid on the federal blanket of *Michigan v. Long*[74] and *Coleman v. Thompson*,[75] ever mindful that the state has the right to define the gateways of state habeas processes—free of federal review if clearly stated.

## B

Lastly, Rocha requests a COA to determine whether the state of Texas violated his rights under Article 36 of the Vienna Convention and whether such a violation warrants the exclusion of his confession. The state admits that it violated the Convention's terms: Rocha is a citizen of Mexico—a fact known to the arresting officer—yet Rocha was never informed of his right to talk to the Mexican consulate. For this violation, Rocha seeks to suppress his confession. The trial court denied relief, and direct and state habeas review upheld that decision. The federal district court also denied relief, explaining that Article 36 did not create individually-enforceable rights.[76]

Rocha acknowledges we have held that Article 36 does not create individually-enforceable rights but wants a COA so that he may pursue en banc

---

[74] 463 U.S. 1032.

[75] 501 U.S. 722.

[76] The district court also observed that the International Court of Justice ("ICJ") has already determined that Rocha's rights under the treaty were not substantively violated. While it is true that the ICJ refused to find that Mexico's right to "arrange for [Rocha's] legal representation" had not been violated, it found that the state violated the Convention when it failed to inform Rocha of his right to request that the authorities inform his government's consulate that he had been detained. *Case Concerning Avena and Other Mexican Nationals (Mexico v. United States)*, 2004 I.C.J. 12; *see also Medellín II*, 552 U.S. at 502. The rights of an individual are distinct from those of a government under the Convention, and the ICJ decision is not determinative here.

consideration.[77]   He points to the Supreme Court's 2006 decision in *Sanchez-Llamas* where four justices—Ginsburg, Breyer, Stevens, and Souter—expressed their belief that the Vienna Convention does create individually-enforceable rights.[78]  Without a clear holding from the Court, however, our precedent stands and we must decline Rocha's request for a COA on this issue.

Even if we were to take up the subject as a full court, Rocha's requested remedy—suppression of inculpatory statements—is unavailable.  *Sanchez-Llamas* held that suppression of evidence is not an available remedy where, as here, the Vienna Convention "does not provide [that] particular remedy, either expressly or implicitly."[79]  Absent a prescribed remedy, "it is not for the federal courts to impose one on the States through lawmaking of their own."[80]  And in any event, suppression here would upend the state courts' determination that Rocha knowingly and voluntarily confessed and did not desire an attorney at that time, whether provided to him by the Mexican consulate or not.

\* \* \*

We AFFIRM the district court, DENY relief on the *Brady* claim, DENY a COA on the claim under the Vienna Convention, and HOLD that Rocha was not entitled to have his *Wiggins* claim considered on the merits but GRANT a COA on that question.  Because we are convinced that the issue on which we grant the COA has been fully briefed and squarely addressed at oral argument by able

---

[77] *See, e.g.*, *Leal Garcia v. Quarterman*, 573 F.3d 214, 218 n.19 (5th Cir. 2009); *Cardeñas v. Dretke*, 405 F.3d 244, 253 (5th Cir. 2005).

[78] *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 360 (Ginsburg, J., concurring in the judgment); *id.* at 365 (Breyer, J., dissenting).

[79] *Id.* at 347.

[80] *Id.*

counsel, we will not seek additional briefing.  In addition, we instruct the clerk of the court not to issue the mandate in this case until the mandate issues in *Balentine*.

HAYNES, Circuit Judge, concurring and dissenting:

I concur in the majority opinion with the exception of Section III.A. and the portion of the conclusion reflecting that ruling. I agree that a COA should be granted on this issue, but I respectfully dissent from the majority opinion's determination, at this stage, that Rocha is not entitled to have a federal court review the merits of his *Wiggins* claim. The majority opinion represents a deft and scholarly approach, but it also represents a novel analysis not fully consonant with this court's recent decision in *Balentine v. Thaler*, 609 F.3d 729 (5th Cir. 2010), as well as other decisions of this court.

In *Balentine*, we addressed a case with an almost identical procedural posture and reversed the district court's denial of the habeas petitioner's Rule 60(b) motion as an abuse of discretion. We concluded that a Texas Court of Criminal Appeals's decision denying habeas relief on a successive petition did not rest upon an independent state-law ground because "that denial could have been a decision that the facts were previously available and no excuse from presenting the claim earlier existed—an adequate and independent state ground—or that denial could have been based on a finding that the facts as alleged did not indicate a federal constitutional violation." 609 F.3d at 737. Because the basis for the Texas Court of Criminal Appeals's decision could have rested on a finding that the petitioner failed to allege facts establishing a federal constitutional violation—a question of federal constitutional law—the court concluded that Balentine was entitled to have a federal court review the merits of his *Wiggins* claim. *Id.* at 738 (citing *Ruiz v. Quarterman*, 504 F.3d 523 (5th Cir. 2007)).

30

*Balentine* and *Ruiz* support a reversal of the district court's denial of Rocha's Rule 60(b) motion in the instant case. Here, the Texas Court of Criminal Appeals's decision rested upon a finding that Rocha's allegations "do not satisfy the requirements of Article 11.071, Section 5(a)(3)." Under our decisions in *Balentine* and *Ruiz*, the Texas Court of Criminal Appeals's decision—relying on § 5(a)(3), which incorporates federal constitutional law—was based on the merits of Rocha's federal constitutional claim rather than an independent state-law ground. *Balentine*, 609 F.3d at 738 ("[A] ruling that the facts, if established, did *not* constitute a violation would also be 'interwoven' with federal constitutional law."); *Ruiz*, 504 F.3d at 527 ("The boilerplate dismissal by the CCA of an application for abuse of the writ is itself uncertain on this point, being unclear whether the CCA decision was based on the first element [whether the factual or legal basis for the subsequent claim was previously unavailable], a state-law question, or on the second element [whether the facts alleged would establish a federal constitutional violation], a question of federal constitutional law."). In short, our prior decisions in *Balentine* and *Ruiz* suggest that the Texas Court of Criminal Appeals's decision in this case was merits-based rather than procedural, entitling Rocha to federal merits review of his *Wiggins* claim.

The majority opinion does not attempt to reconcile today's result with our prior holding in *Balentine,* and it does not fully reconcile this case with *Ruiz*, *Hughes*,[1] and *Rivera*.[2] Instead, the majority opinion instructs the clerk of the court to hold the mandate in this case because a petition for rehearing en banc has been filed in *Balentine*. The majority opinion's approach is collegial but contrary to the circuit's rule that one panel cannot overrule a prior panel's decision in the absence of an intervening or superseding decision by the United States Supreme Court or a decision by this court sitting en banc. *Burge v.*

---

[1] *Hughes v. Quarterman*, 530 F.3d 336 (5th Cir. 2008).

[2] *Rivera v. Quarterman*, 505 F.3d 349 (5th Cir. 2007).

*Parish of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999) ("It is a firm rule of this circuit that in the absence of an intervening contrary or superseding decision by this court sitting en banc or by the United State Supreme Court, a panel cannot overrule a prior panel's decision."). Because this court's prior decisions in *Balentine* and *Ruiz* have not been overruled or altered as of this date, we are bound to follow those decisions.

Our court's jurisprudence in this area—including *Balentine*, *Ruiz*, *Hughes,* and *Rivera*—creates confusion as to the precise language that will be considered to be "an independent and adequate state ground" in cases where the state court does not elaborate on its reasoning. En banc consideration of *Balentine* (perhaps together with this case) may very well be appropriate but, as of this time, the court has yet to take that action, and *Ruiz* and *Balentine* remain controlling precedent. In the meantime, at a minimum, it makes little sense to hold the mandate in this case while denying the parties full briefing and possibly further oral argument on this issue. I would, at the very least, allow full briefing by the parties before deciding the merits of the procedural default question and, if appropriate, the merits of the *Wiggins* claim.[3]

---

[3] The majority opinion states that the issue of whether Rocha is entitled to federal merits review has already been "fully briefed and squarely addressed" by the parties at oral argument. But oral argument in this case was heard on June 14, 2010, and the *Balentine* decision was not released until June 18, 2010. Thus, the parties could not have fully briefed and argued the impact of *Balentine* on the instant case because that decision had not yet been released. While the parties did submit letters pursuant to Federal Rule of Appellate Procedure 28(j) addressing the impact of *Balentine*, they did not get the benefit of full briefing or the opportunity to address the majority opinion's novel interpretation of § 5(a)(3). Indeed, no other federal appellate court to date has applied this approach in such a situation. Accordingly, I conclude that this case would benefit from full briefing on whether, under *Balentine*, *Ruiz*, or the approach set forth in the majority opinion, federal merits review of Rocha's *Wiggins* claim is appropriate.