# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 31, 2011

Lyle W. Cayce
Clerk

No. 10-70023

BEUNKA ADAMS,

Petitioner – Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent – Appellee

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 5:07-CV-180

Before KING, BENAVIDES, and ELROD, Circuit Judges.

PER CURIAM:[*]

Habeas petitioner Beunka Adams was convicted and sentenced to death
in Texas state court for the capital murder of Kenneth Vandever. Adams filed
a petition for a writ of habeas corpus in the United States District Court for the
Eastern District of Texas pursuant to 28 U.S.C. § 2254. The district court denied
Adams's petition but granted Adams a certificate of appealability on all of his

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 10-70023

claims.  For the reasons detailed below, we affirm the judgment of the district court denying Adams's petition.

## BACKGROUND

On September 2, 2002, Petitioner Beunka Adams, along with Richard Cobb, robbed a convenience store in Rusk, Texas.  At the time of the robbery, Candace Driver and Nikki Dement were working in the store, and the only customer present was Kenneth Vandever.  Vandever, who was described as mentally challenged, often "hung around" the store, helping clean and take out the trash.  At approximately 10:00 p.m., Adams and Cobb, wearing masks, entered the store.  Cobb carried a 12-gauge shotgun.  Adams ordered Driver, Dement, and Vandever to the front of the store and demanded the money in the register.  After the women complied, Adams demanded the keys to a Cadillac parked in front of the store.  Driver, who had borrowed the car to drive to work, retrieved the keys from the back room.

Adams then ordered the three victims into the Cadillac with Adams and Cobb, and Adams drove toward Alto, Texas.  During the drive, Adams removed his mask after Dement recognized him because they had gone to school together.  Adams then repeatedly told the victims that they would not be hurt, and that he just needed money for his children.  At some point, Adams turned off the road and drove the vehicle into a field that was described as a pea patch.

The group got out of the car, and Adams ordered Driver and Vandever into the trunk.  Adams then escorted Dement away from the car and sexually assaulted her.  After leading Dement back to the Cadillac, Adams released Driver and Vandever from the trunk, and he told the victims that he and Cobb were waiting for Adams's friends to arrive. Sometime thereafter, Adams decided to let the three victims walk away.  He reconsidered a few moments later, however, and Driver stated that Adams feared the victims would reach a house before he and Cobb could get away.  Adams and Cobb then made the three

2

victims kneel on the ground.  He tied the women's hands behind their backs using their shirts but left Vandever unrestrained.  The victims were unable to remember who was carrying the shotgun through these events.

Adams and Cobb stood behind the victims for several minutes, and the victims could tell they were discussing something, though they were out of audible range.  The women then heard a single shot.  Adams asked, "Did we get anybody?" and Driver answered, "No."  They heard a second shot a few moments later, and Vandever cried out, "They shot me."  A third shot struck Dement.  When Dement fell forward, Driver fell forward as well, pretending to be hit.  Adams, carrying the shotgun, approached Driver and asked if she was bleeding.  Driver did not answer, hoping the men would believe she was dead.  When Driver did not immediately answer, Adams said, "Are you bleeding?  You better answer me.  I'll shoot you in the face if you don't answer me."  Driver answered, "No, no, I'm not bleeding."  Adams then fired the shotgun right next to her face, and, though the pellets only hit her lip, she did not move, pretending to be dead.

Adams and Cobb turned to Dement and asked her the same questions.  She feigned death, and the men started kicking her when she did not answer.  Adams then grabbed Dement's hair and held up her head while one of the men shined a lighter on her face to see if she was still alive.  Dement continued feigning death, and Driver heard Cobb say, "She's dead.  Let's go."  That was the only time any of the victims heard Cobb speak.  After Adams and Cobb left, Driver and Dement, each fearing that the other was dead, got up and ran in separate directions.  Driver had minor injuries, but Dement had been shot directly in the left shoulder.  By the time police arrived at the pea patch, Vandever, who had been shot in the chest, had died from the shotgun wound.

No. 10-70023

A grand jury indicted Adams for the capital murder of Kenneth Vandever pursuant to Texas Penal Code § 19.03(a)(2).[1] Adams pleaded not guilty, and the case was tried before a jury. The jury found Adams guilty of capital murder and sentenced him to death.

The Texas Court of Criminal Appeals (TCCA) affirmed Adams's conviction and sentence on direct appeal. *Adams v. State*, No. AP-75023, 2007 WL 1839845 (Tex. Crim. App. June 27, 2007). Adams filed a state habeas application, in which he asserted, among other claims, several ineffective assistance of counsel claims. The TCCA referred the application to the trial court and the trial court heard evidence on Adams's claims, including testimony from both of Adams's trial attorneys. The trial court entered findings of fact and conclusions of law and recommended denying Adams's habeas application. The TCCA adopted the trial court's findings of fact and conclusions of law and denied Adams's application. *Ex parte Adams*, No. WR-68066-01, 2007 WL 4127008 (Tex. Crim. App. Nov. 21, 2007). Adams filed a second state habeas application on December 29, 2008, asserting two new claims related to the jury instructions given during the sentencing phase of his trial. The TCCA dismissed the application as an "abuse of the writ." *Ex parte Adams*, No. WR-68066-02, 2009 WL 1165001 (Tex. Crim. App. Apr. 29, 2009).

Before the TCCA ruled on his second habeas application, Adams filed a federal habeas petition on January 8, 2009, in which he asserted ten claims for relief, including the two claims that he had presented in his second state habeas application. After the TCCA dismissed Adams's second application, the district

---

[1] In 2002, section 19.03(a)(2) provided, "A person commits [capital murder] if he commits murder as defined under Section 19.02(b)(1) and . . . the person intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, or obstruction or retaliation." Tex. Penal Code Ann. § 1903(a)(2) (West 2003). Section 19.02(b)(1) provided, "A person commits [murder] if he . . . intentionally or knowingly causes the death of an individual." Tex. Penal Code Ann. § 19.02(b)(1) (West 2003).

4

No. 10-70023

court dismissed the two claims Adams had presented in his second state habeas application as procedurally barred and denied the remaining claims. *Adams v. Thaler*, No. 5:07-cv-180, 2010 WL 2990967 (E.D. Tex. July 26, 2010). The district court granted Adams a certificate of appealability (COA) on the ten claims Adams presented in his federal habeas petition and on the issue whether two of his claims are procedurally barred.

## STANDARD OF REVIEW

Adams's petition is governed by the standards of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). AEDPA "imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, — U.S. —, 130 S. Ct. 1855, 1862 (2010) (citations and internal quotation marks omitted). Under AEDPA, if a state court has adjudicated a habeas petitioner's claim on the merits, a federal court may grant habeas relief only if the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"A state court's decision is deemed contrary to clearly established federal law if it reaches a legal conclusion in direct conflict with a prior decision of the Supreme Court or if it reaches a different conclusion than the Supreme Court based on materially indistinguishable facts." *Gray v. Epps*, 616 F.3d 436, 439 (5th Cir. 2010) (citing *Williams v. Taylor*, 529 U.S. 362, 404–08 (2000)). "To merit habeas relief, a state habeas court's application of federal law must be not only incorrect but 'objectively unreasonable.' " *Maldonado v. Thaler*, 625 F.3d

No. 10-70023

229, 236 (5th Cir. 2010) (quoting *Renico*, 130 S. Ct. at 1865). A state court's factual findings "shall be presumed to be correct," but the petitioner may rebut this presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

## DISCUSSION

### I.    Richard Cobb Testimony

Adams first claims that his trial counsel was ineffective for failing to present evidence to the jury that Adams's co-defendant, Richard Cobb, confessed to firing the shot that killed Kenneth Vandever. To prevail on his ineffective assistance of counsel claim, Adams must show (1) that his trial counsel's performance was deficient, and (2) that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under the performance prong, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Judicial scrutiny of counsel's performance is "highly deferential" and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 689–90. "[A] conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009) (citation and internal quotation marks omitted). The prejudice prong requires a petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

The TCCA concluded that Adams's counsel rendered effective assistance because counsel's decision not to present evidence of  Cobb's confession was sound trial strategy. Under AEDPA, our review is limited to a consideration of whether the TCCA's holding was an unreasonable application of *Strickland*. *See Henderson v. Quarterman*, 460 F.3d 654, 665 (5th Cir. 2006). We cannot say

6

that the TCCA's determination that Adams's counsel rendered adequate assistance was unreasonable.

Adams and Cobb were tried separately, and Cobb's trial occurred first. During his trial, Cobb testified on his own behalf, stating that he never intended anyone to be hurt during the robbery. He testified that the robbery was Adams's idea and gave the following version of events: According to Cobb, the two had planned to enter and exit the store quickly, but Adams ordered the three victims to accompany them in the vehicle when they left the store. Cobb stated that when the group arrived at the pea patch, it was Adams who was in control of the situation, and, after assaulting Dement and using the victims's shirts to restrain their arms, Adams told Cobb that there had been a "change in plans" and "we are going to have to off them." Cobb testified that Adams told Cobb to fire the shotgun at the victims. According to Cobb, he did not want to shoot the victims and pretended that the shotgun had jammed so he would not have to shoot them. Adams grabbed the gun to fix the "jam" and fired the first shot that did not hit any of the victims. Adams then gave the gun back to Cobb and directed him to shoot at the victims. When Cobb hesitated, Adams told Cobb that if only one of them did the shooting only one of them was leaving, i.e., that Adams would kill Cobb if Cobb did not shoot at the victims. Cobb stated that he was scared of Adams so he fired the shot that hit Vandever. Adams then took the gun from Cobb and fired the shot that hit Dement. Adams approached the girls and fired the shot close to Driver's face. Cobb also testified that Adams was the only one to kick Dement to see if she was still alive.

In Adams's trial, his attorneys presented a similar but reversed defense. They argued that Adams was following Cobb's orders during the robbery and that Adams never intended that anyone be hurt. To underscore Adams's lack of lethal intent, Adams's counsel stressed Adams's statements in the car that he did not want anyone to be hurt and that he only robbed the store because he

needed money for his children.  They argued that the only shot Adams fired was the one that he fired at Driver.  They argued that Cobb ordered Adams to shoot Driver, but that Adams must have purposefully missed in order to spare her life because he fired the gun at such close range he could not have missed unless he intended to do so.

At one point during the trial the State agreed to tell the jury that Cobb fired the shot that killed Vandever but only if the jury would also hear that Adams had fired the shot that struck Dement.  Adams's counsel decided not to take the agreement, instead arguing to the jury that Adams had not fired either of the shots that struck Vandever and Dement.  The State presented testimony from Adam's former cellmate, Lavar Bradley, who testified that Adams had confessed to the shooting, but Adams's counsel vigorously cross-examined Bradley about his motives for testifying and Bradley could not say which particular shots Adams had confessed to firing.  To prove that Adams had not fired the two shots that struck Vandever and Dement, Adams's counsel presented testimony from James Hamilton, Cobb's former cellmate, who testified that Cobb had confessed to shooting Vandever.  Adams's counsel also emphasized that Dement and Driver were unable to definitely say who fired the shot that killed Vandever and the one that struck Dement.  The State even conceded during its closing argument that "the testimony of Candace Driver and Nikki [Dement] doesn't prove who shot Kenneth Vandever."

Adams argues that if the jurors had heard Cobb's testimony that he fired the fatal shot, they would not have sentenced him to death because they would have concluded that Adams did not intend to kill Vandever.  Adams also argues that his counsel was ineffective for failing to enter into the stipulation offered by the State.  At the hearing held on Adams's first state habeas application, both of Adams's attorneys testified that they considered all of the evidence and decided against presenting Cobb's testimony for strategic reasons.  They stated

that presenting Cobb's testimony or entering into the stipulation with the State would have undermined their defense because Cobb had testified that Adams threatened him, that Adams had fired the shot that struck Dement, and that Adams was the only one to kick Dement.

Adams cannot overcome the strong presumption that his counsel's decision not to present the Cobb evidence was a reasonable strategic choice. *See Strickland*, 466 U.S. at 689 (noting that counsel must have "wide latitude" in making tactical decisions). Given the tenor of Adams's defense at trial, his counsel's decision not to present the Cobb testimony was a reasoned trial strategy. Under Texas law, if Adams's counsel had presented the portion of Cobb's testimony in which Cobb admitted to shooting Vandever, the State would have been able to enter the remainder of the transcript, including the damaging portions of Cobb's testimony, into evidence under the rule of optional completeness. *See* Tex. R. Evid. 107. Similarly, if Adams's counsel had called Cobb to testify, the State could have cross-examined Cobb on any of his previous testimony. This additional evidence would have undermined Adams's defense that Cobb was the aggressor and that Adams was the one simply following orders.

For the same reasons, Adams cannot demonstrate that he suffered prejudice as a result of his counsel's failure to introduce the Cobb testimony. In determining whether a petitioner suffered prejudice, we are to "exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like," and instead we are to consider "the totality of the evidence" before the jury. *Strickland*, 466 U.S. at 695. If the Cobb testimony had been before the jury, there would have been evidence that Adams directed Cobb to shoot Kenneth Vandever and that Adams was the one to shoot Nikki Dement. Although Cobb's testimony would have demonstrated that Adams did not fire the fatal shot, the remainder of Cobb's testimony is so inculpatory that the exclusion of his

No. 10-70023

testimony does not undermine our confidence in the outcome of the trial.[2]  *See*
*id.* at 694.

## II.   Jury Instructions Regarding Intent

Adams's next two claims relate to the jury instructions given during the
sentencing phase of his trial.  After the jury found Adams guilty of capital
murder, the jury was required to answer several special issues to determine
whether Adams would be sentenced to death.  During the guilt/innocence phase,
the jury was instructed that they could find Adams guilty under the law of
parties, Tex. Penal Code Ann. § 7.02.[3]  Therefore, the jury could find Adams
guilty of capital murder even if they found that Cobb, not Adams, fired the shot

---

[2] Attached to both his state and federal habeas petitions, Adams provided an affidavit
from an investigator who interviewed a juror who had served on Adams's jury.  The
investigator stated that the juror told the investigator that knowing of Cobb's confession
"would have made a difference in his punishment decision."  We cannot consider the affidavit
as evidence of prejudice because such statements by jurors are inadmissible.  Fed. R. Evid.
606(b); *Summers v. Dretke*, 431 F.3d 861, 873 (5th Cir. 2005).  Moreover, there is nothing in
the affidavit to suggest that the juror was told about the portions of Cobb's testimony that
were damaging to Adams's defense.

[3] Section 7.02 provides:

(a) A person is criminally responsible for an offense committed by the conduct
of another if:

> (1) acting with the kind of culpability required for the offense, he
> causes or aids an innocent or nonresponsible person to engage in
> conduct prohibited by the definition of the offense;
> (2) acting with intent to promote or assist the commission of the
> offense, he solicits, encourages, directs, aids, or attempts to aid
> the other person to commit the offense; or
> (3) having a legal duty to prevent commission of the offense and
> acting with intent to promote or assist its commission, he fails to
> make a reasonable effort to prevent commission of the offense.

(b) If, in the attempt to carry out a conspiracy to commit one felony, another
felony is committed by one of the conspirators, all conspirators are guilty of the
felony actually committed, though having no intent to commit it, if the offense
was committed in furtherance of the unlawful purpose and was one that should
have been anticipated as a result of the carrying out of the conspiracy.

Tex. Penal Code Ann. § 7.02 (West 2003).

10

that killed Kenneth Vandever.  Because Adams was convicted under the law of parties, the jury was required to answer an additional special issue regarding Adams's intent during the sentencing phase:

> Do you find from the evidence beyond a reasonable doubt that BEUNKA ADAMS, the defendant himself, actually caused the death of KENNETH WAYNE VANDEVER, the deceased, on the occasion in question, or, if he did not actually cause the deceased's death, that he intended to kill the deceased or another or that he anticipated that a human life would be taken?

Adams argues that his sentence of death violates the Eighth Amendment because the jury could have sentenced him to death if they found that he only anticipated that a human life would be taken, a level of culpability too low to warrant the death penalty under *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987).  He also argues that his appellate counsel was ineffective for failing to raise the issue on direct appeal.

Adams did not present these claims in his initial state habeas application, and when he tried to exhaust the claims in a subsequent application, the TCCA dismissed the subsequent application as an "abuse of the writ."  The district court below dismissed these claims as procedurally defaulted, concluding that the TCCA had dismissed the claims for failure to follow state-law procedure.  On appeal, Adams appears to concede that our circuit precedent compels the conclusion that his claims are procedurally defaulted but argues that he meets the standard to overcome the procedural default.

## A.    Procedural Default

We first address whether Adams's claims are, in fact, procedurally defaulted.  A federal court generally cannot review the merits of a state prisoner's habeas petition if the prisoner presented his constitutional claim to the highest available state court but the court dismissed the claim on an

No. 10-70023

adequate and independent state-law procedural ground rather than deciding the claim on the merits. *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991).

Under Texas law, after the filing of a prisoner's initial state habeas application in a death penalty case, the TCCA cannot consider the merits of a subsequent application unless the application satisfies one of three requirements. The application must allege specific facts establishing that:

> (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application . . . because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;
>
> (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt; or
>
> (3) by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial . . . .

Tex. Code Crim. Proc. art 11.071, § 5(a) (West 2005). If an application does not meet any of the standards in section 5(a), the TCCA must dismiss the application as an abuse of the writ. *Id.* § 5(c).

Adams argues that the TCCA's perfunctory dismissal of his subsequent application as an abuse of the writ was not based on an adequate and independent state-law procedural ground. He contends that the language of the dismissal order is ambiguous as to whether the TCCA reached the merits of his claim and that, under *Michigan v. Long*, 463 U.S. 1032 (1983), we must presume that the TCCA rested its decision on federal law.

We recently clarified our understanding of the Texas abuse of the writ doctrine in a pair of cases. *See Balentine v. Thaler*, 626 F.3d 842 (5th Cir. 2010); *Rocha v. Thaler* (*Rocha I*), 619 F.3d 387 (5th Cir. 2010), *clarified and panel rehearing denied*, *Rocha v. Thaler* (*Rocha II*), 626 F.3d 815 (5th Cir. 2010).

12

No. 10-70023

Under *Balentine* and *Rocha*, we must first determine which of the subsections quoted above the TCCA relied upon in dismissing Adams's subsequent application. The TCCA's dismissal order simply stated, "We have reviewed the application and find that the allegations do not satisfy the requirements of Article 11.071, Section 5. Therefore, we dismiss this application as an abuse of the writ." *Ex parte Adams*, 2009 WL 1165001, at *1. Where, as here, the TCCA does not identify the subsection on which it relied in dismissing the application as an abuse of the writ, we look to the application itself to determine the subsection the petitioner relied on in presenting his subsequent application to the TCCA. *Balentine*, 626 F.3d at 854. In his second state habeas application, Adams specifically alleged that his application met the requirements of subsections 5(a)(2) and 5(a)(3). He did not claim under section 5(a)(1) that the factual or legal basis was unavailable at the time he filed his initial state habeas application.[4]  Therefore, we do not consider whether the TCCA reached the merits of Adams's claims in determining whether Adams's application met the requirements of section 5(a)(1).

Although Adams identified section 5(a)(2) as a basis for his subsequent application, section 5(a)(2) is inapplicable. Adams did not argue that no reasonable juror would have found him guilty beyond a reasonable doubt. *See Ex parte Brooks*, 219 S.W.3d 396, 398 (Tex. Crim. App. 2007) ("[A]n applicant must accompany constitutional-violation claims with a prima facie claim of actual innocence in order to satisfy the requirements of [section 5(a)(2)]."). Instead, all of the arguments in his subsequent petition relate to the instructions given during the sentencing phase of trial. Because we must focus on the

---

[4] Adams's claims are based on *Enmund v. Florida*, 458 U.S. 782 (1982) and *Tison v. Arizona*, 481 U.S. 137 (1987), both of which were decided before the filing of his initial application, and Adams alleged no new factual basis for his claims.

13

arguments presented to the TCCA, we conclude that Adams's only asserted basis for the TCCA to entertain his subsequent petition was section 5(a)(3).

We squarely addressed the TCCA's summary dismissal of a claim under § 5(a)(3) in *Rocha*. There, the TCCA specifically stated that Rocha's application had not met the requirements of section 5(a)(3) and the court dismissed the application as an abuse of the writ. *Rocha I*, 619 F.3d at 399. We held that the TCCA had dismissed Rocha's application on independent and adequate state-law procedural grounds, and we were thus prevented from reviewing the claims in the dismissed application because they were procedurally defaulted. *Id.* at 402–06; *see also Rocha II*, 626 F.3d at 826 & n.44. Adams concedes that our decisions in *Rocha* and *Balentine* compel the conclusion that his *Enmund/Tison* claims are procedurally defaulted. Therefore, we can reach the merits of Adams's claims only if he can overcome the procedural default.

### B.   Cause and Prejudice

A petitioner can overcome a procedural default in one of two ways. First, he can show "cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman*, 501 U.S. at 750. Second, a federal court can review the merits of the petition if the petitioner can show that failure to do so would result in a fundamental miscarriage of justice. *Id.* One way to demonstrate a fundamental miscarriage of justice is to show that the petitioner is actually innocent of the death penalty. *Sawyer v. Whitley*, 505 U.S. 333, 340 (1992).

Adams does not argue that he can overcome the procedural default under the fundamental miscarriage of justice exception because he is actually innocent of the death penalty. This argument is therefore waived.[5] *Elizalde v. Dretke*,

---

[5] Even if Adams had not waived this argument by failing to brief it, he would not be able to demonstrate that, "but for a constitutional error, no reasonable juror would have found [him] eligible for the death penalty." *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992). If the

362 F.3d 323, 328 n.3 (5th Cir. 2004); *see also Dowhitt v. Johnson*, 230 F.3d 733, 741 n.6 (5th Cir. 2000) (finding that petitioner had waived "sub-issues" that would support his actual innocence claim because they were presented in his reply brief and not in his opening appellate brief).

Adams instead argues that he can demonstrate cause and prejudice for the procedural default. Specifically, he argues that his claims were procedurally defaulted due to the ineffective assistance of his trial and appellate counsel in failing to raise the claims at trial and on appeal. Adams's claim that his counsel was ineffective for not raising the issue at trial and on appeal could have been brought in his first state habeas application. Although Adams was represented by counsel in filing his first application, he cannot overcome the procedural default by claiming that his state habeas counsel was ineffective for failing to raise his claims, and in any event Adams has not made this argument. *See Ries v. Quarterman*, 522 F.3d 517, 526 n.5 (5th Cir. 2008) ("[T]he ineffective assistance of state habeas counsel cannot provide cause to excuse a procedural default."). Therefore, Adams cannot demonstrate cause sufficient to overcome the procedural default, and we affirm the district court's dismissal of Adams's *Enmund/Tison* claims.

## III.   State's Expert on Future Dangerousness

The district court granted Adams a COA on his claim that his trial counsel rendered ineffective assistance by failing to investigate and fairly challenge the State's expert on future dangerousness, Dr. Tynus McNeel, who testified on behalf of the State that Adams was a continuing threat to society. The district court denied the claim, concluding that Adams had not demonstrated that his counsel's performance was deficient or that he was prejudiced in any way.

---

allegedly infirm language were removed from the jury instruction, the evidence before the jury was sufficient such that reasonable jurors could find that Adams actually caused Vandever's death or that he intended to cause the death of Vandever or another.

Adams has abandoned this claim by failing to brief it on appeal. *See Banks v. Thaler*, 583 F.3d 295, 329 (5th Cir. 2009) ("It is well established, of course, that an appellant abandons all issues not raised and properly presented in its initial brief on appeal.").

## IV. Extrinsic Victim Impact Testimony

Adams next claims that the trial court erroneously allowed Nikki Dement to give "extraneous victim impact testimony," and that his appellate counsel was ineffective for failing to recognize and brief the issue on direct appeal. During the sentencing phase of Adams's trial, Dement testified on behalf of the State regarding the effect the shooting has had on her life. She testified that her injuries affected her school and career options, that she was unable to enjoy her wedding and honeymoon because she was still recovering, and that the lasting effects of her injuries had caused problems with her pregnancy. She also testified that she had trouble sleeping at night and that she could not be alone in her house at night. Adams's trial counsel objected to Dement's testimony as extraneous victim impact testimony because Vandever, not Dement, was the victim of the capital murder for which Adams was convicted. Adams's appellate counsel, however, did not raise the issue in his direct appeal to the TCCA.

Ineffective assistance of appellate counsel claims are governed by the test set forth in *Strickland v. Washington. Amador v. Quarterman*, 458 F.3d 397, 410 (5th Cir. 2006). Therefore, Adams must demonstrate that his appellate counsel's performance in not raising his claim was deficient and that he was prejudiced by the deficient performance because the outcome of his appeal would have been different. *Id.* at 410–11. "Counsel need not raise every nonfrivolous ground of appeal, but should instead present solid, meritorious arguments based on directly controlling precedent." *Ries v. Quarterman*, 522 F.3d 517, 531–32 (5th Cir. 2008) (citation and internal quotation marks omitted).

No. 10-70023

The Supreme Court has held that there is no per se bar under the Eighth Amendment to the admission of victim impact testimony. *Payne v. Tennessee*, 501 U.S. 808, 827 (1991). Rather, the admission of such evidence during the punishment phase is limited only by the Due Process Clause of the Fourteenth Amendment if the evidence "is so unduly prejudicial that it renders the trial fundamentally unfair." *Id.* at 825. Texas has limited the introduction of victim impact testimony in certain circumstances. For example, in *Cantu v. State*, 939 S.W.2d 627 (Tex. Crim. App. 1997), the TCCA held that the trial court had erred in admitting victim impact testimony from the mother of a victim not named in the indictment because the evidence was extraneous to the crime charged. *Id.* at 637. The defendant had participated in the murder of two teenage girls but was indicted for only one of the murders. *Id.* at 635. The TCCA held that the testimony regarding the other victim's character and the impact of her death on her family was irrelevant and unduly prejudicial because the defendant had not been indicted and tried for the murder of that victim. *Id.* at 637.

After *Cantu*, the TCCA further defined the categories of victim-related evidence that would be permitted in the sentencing phase "Victim character" evidence—"evidence concerning good qualities possessed by the victim"—and "victim impact" evidence—"evidence concerning the effect that the victim's death will have on others, particularly the victim's family members"—are admissible, with some limitations, in the sentencing phase with regard to the victim of the crime for which the defendant was convicted. *Mosley v. State*, 983 S.W.2d 249, 261–62 (Tex. Crim. App. 1998). Since *Mosley*, the TCCA has permitted testimony that relates to the victim of a crime not described in the indictment but that does not fall into the category of "victim impact" or "victim character" testimony. *Mathis v. State*, 67 S.W.3d 918, 928 (Tex. Crim. App. 2002) (finding no error in the admission of testimony from the caregiver of a victim injured in the same criminal episode but not named in the indictment because the

17

testimony did not involve the character of the victim or the effect of her injuries on third persons); *Roberts v. State*, 220 S.W.3d 521, 531 (Tex. Crim. App. 2007) (finding no error in the admission of testimony from the victim of a previous crime because " '[v]ictim impact' evidence is evidence of the effect of an offense on people *other* than the victim"); *Mays v. State*, 318 S.W.3d 368, 393 (Tex. Crim. App. 2010) (finding no error in the admission of testimony from two officers involved in a police shootout but not named as victims of the crimes for which the defendant was indicted because they testified about their own injuries and losses).

In denying Adams's claim, the TCCA found that *Cantu* was factually distinguishable from the present case because the testimony was given by a victim of one of the underlying offenses and the victim did not testify about her good character or the effect of her injuries on her family. Instead she testified about the details of her injuries and their long term effect on her. The court concluded that Dement's testimony was admissible under *Mathis* because she was injured in the same criminal episode as the victim of the capital murder and that evidence from a victim of an extraneous offense as to the emotional effect on her is admissible under *Roberts*. The TCCA thus held that Adams's appellate counsel had not rendered ineffective assistance by failing to raise the issue on appeal.

The TCCA's holding is not an unreasonable application of *Strickland*. With *Cantu* among the guiding precedents, the argument that the trial court erred in admitting Dement's testimony during the punishment phase of Adams's trial was certainly cognizable and nonfrivolous. However, the TCCA decided *Mathis* three years before Adams's counsel filed his appellate brief and his counsel could have reasonably concluded that pursuing the argument that Dement's testimony was inadmissible would have been futile in light of the

TCCA's holding in *Mathis* that certain testimony about a victim injured in the same criminal episode is admissible.

Moreover, Adams cannot demonstrate that he was prejudiced by his appellate counsel's performance because he cannot show that the outcome of his appeal would have been different if his counsel had briefed the issue. Although *Roberts* and *Mays* were decided after Adams's appeal, those cases demonstrate that the TCCA will not find error in the admission of the testimony of a victim of a crime not described in the indictment when the victim testifies regarding her own injuries and the effect the crime had on her own life. We therefore affirm the district court's denial of this claim.

## V.    Burden of Proof on Mitigation Issue

Adams next claims that the Texas statute authorizing the jury to impose the death penalty is unconstitutional. Article 37.071 of the Texas Code of Criminal Procedure requires the jury to make several findings to determine whether the defendant will receive a sentence of death. First, the jury is asked to determine beyond a reasonable doubt "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.071, § 2(b)(1) (West 2006). Second, if the defendant is convicted under the law of parties, as discussed above, the jury is asked whether, beyond a reasonable doubt, "the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken." *Id.* § 2(b)(2). If the jury answers both of these questions in the affirmative, the jury is then asked to determine, considering all evidence presented at the guilt/innocence phase and at the punishment phase, whether any evidence mitigates against imposition of the death penalty. *Id.* at § 2(e)(1).

No. 10-70023

Adams argues that his Eighth and Fourteenth Amendment rights were violated because the statute impermissibly placed the burden of proving the mitigation issue on him, rather than requiring the State to prove the absence of mitigating factors beyond a reasonable doubt. He argues that under *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), any fact that increases the available punishment, including the absence of mitigating evidence, must be proved by the State beyond a reasonable doubt.

The district court concluded that this claim was foreclosed by our decisions in *Rowell v. Dretke*, 398 F.3d 370 (5th Cir. 2005), and *Granados v. Quarterman*, 455 F.3d 529 (5th Cir. 2006). We agree. The Texas Court of Criminal Appeals has held that under the Texas statutory scheme a defendant is eligible for the death penalty once the jury answers the first and, if applicable, the second special issues, which both require proof beyond a reasonable doubt, in the affirmative. *Perry v. State*, 158 S.W.3d 438, 446–48 (Tex. Crim. App. 2004) ("By the time the jury reaches the mitigation special issue, the prosecution has proven all aggravating 'facts legally essential to the punishment.' " (quoting *Blakely v. Washington*, 542 U.S. 296, 313 (2004)); *Blue v. State*, 125 S.W.3d 491, 500–01 (Tex. Crim. App. 2003) ("Under Article 37.071, there is no authorized increase in punishment contingent on the jury's finding on the mitigating special issue."). We concluded in *Granados* that under Texas law "a finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death." 455 F.3d at 537. We therefore held that the statute does not violate *Apprendi* or *Ring* because "the state was required to prove beyond a reasonable doubt every finding prerequisite to exposing [the defendant] to the maximum penalty of death." *Id.* at 536; *see also Rowell*, 398 F.3d at 378 ("No Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof."). Adams concedes that his claim is foreclosed by our precedent and that he presents this claim only to preserve it

for possible further review. We therefore affirm the district court's denial of this claim.

## VI.   Limitations on Mitigating Evidence

In his federal habeas petition, Adams claimed that his Eighth and Fourteenth Amendment rights were violated because the Texas death penalty statute impermissibly limits the evidence that jurors can consider to be mitigating. The statutory jury instruction asks the jury to consider, in answering the mitigation special issue, the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant. Adams argued that the instruction led the jury to believe they could not consider mitigating evidence that did not fall within these categories. The district court held that this claim was procedurally defaulted because Adams failed to raise it on direct appeal in state court, but the court granted Adams a COA on the issue whether the district court erred in finding procedural default. However, Adams has abandoned this issue by failing to brief it on appeal. *See Banks*, 583 F.3d at 329 ("It is well established, of course, that an appellant abandons all issues not raised and properly presented in its initial brief on appeal.").

## VII.   Jury Instruction on Failure to Answer the Special Issues

Adams next claims that the trial court should have instructed the jury that their failure to answer the special sentencing issues would result in the imposition of a life sentence. Under the Texas capital sentencing scheme, the jury must unanimously answer the first two special issues in the affirmative before the court can impose the death penalty. Tex. Code Crim. Proc. art 37.071, § 2(d)(2). To answer the issues in the negative, ten of the twelve jurors must agree. *Id.* In addition, a sentence of death requires a unanimous negative answer on the mitigation issue and ten jurors must agree in order to answer the mitigation issue affirmatively. *Id.* § 2(f)(2). If the jury answers "no" to either of

No. 10-70023

the first two special issues or "yes" to the third special issue on mitigation, or if the jury fails to answer any of the special issues, the court must sentence the defendant to life in prison. *Id.* § 2(g).

In Adams's case, the trial court instructed the jury that it would impose a life sentence if they answered the first two questions in the negative or the mitigation issue in the affirmative. The verdict form told the jury that the foreperson was not to sign the form if the jury could not agree on an answer to any of the special issues, but the jury was not informed that if they failed to reach an answer on any of the three issues, the court would automatically impose a life sentence. Adams argues that failing to inform the jury that a life sentence, rather than the death penalty, would result if at least ten jurors agreed on the special issues *or* if the jury reached no agreement on the special issues may have confused the jurors and prevented them from individually voting against the death penalty.

Adams relies on the Supreme Court's decisions in *Mills v. Maryland*, 486 U.S. 367 (1988), and *McKoy v. North Carolina*, 494 U.S. 433 (1990), in which the Court held unconstitutional jury instructions that may have prevented the jury from considering mitigating evidence unless all twelve jurors found the existence of a particular mitigating circumstance. We have repeatedly rejected the argument that jury instructions similar to those given in Adams's case are unconstitutional under *Mills* and *McKoy*. *Hughes v. Dretke*, 412 F.3d 582, 594 (5th Cir. 2005); *Miller v. Johnson*, 200 F.3d 274, 288–89 (5th Cir. 2000); *Hughes v. Johnson*, 191 F.3d 607, 628–29 (5th Cir. 1999).

Adams concedes that this claim is foreclosed by our precedent and that he raises the issue only to preserve it for possible further review. He also concedes that we have concluded that any finding that the jury instructions given in this case were unconstitutional would be an extension of *Mills* that we would be barred from applying under *Teague v. Lane*, 489 U.S. 288 (1989). *Hughes v.*

22

*Dretke*, 412 F.3d at 594 ("Because we are barred by *Teague* from extending *Mills*, no clearly established federal law calls into doubt the Texas death penalty statute."). We therefore affirm the district court's denial of this claim.

## VIII. Meaningful Appellate Review

Adams next claims that the State violated his Eighth and Fourteenth Amendment rights by failing to provide meaningful appellate review of the sufficiency of the mitigating evidence he presented. As noted above, the jury was asked to answer three special issues relating to punishment. After answering the first two issues in the affirmative, the jury answered "No" to the following question:

> Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

On direct appeal, Adams argued that he presented sufficient mitigating evidence to warrant the imposition of a life sentence rather than the death penalty. In keeping with its precedent, the TCCA held that it "does not review the jury's finding on the mitigation issue for sufficiency of the evidence because 'the determination as to whether mitigating evidence calls for a life sentence is a value judgment left to the discretion of the fact finder.'" *Adams v. State*, 2007 WL 1839845, at *4 (quoting *Green v. State*, 934 S.W.2d 92, 106–07 (Tex. Crim. App. 1996)). Adams argues that his constitutional rights were violated under *Parker v. Dugger*, 498 U.S. 308 (1991), and *Clemons v. Mississippi*, 494 U.S. 738 (1990), when the State failed to accord "meaningful appellate review" to every determination relevant to the punishment issue.

We first note that this claim may be procedurally defaulted. In denying Adams's state habeas application, the TCCA stated that the claim was

procedurally barred because it was not raised on direct appeal.  The TCCA also alternatively considered and rejected Adams's claim on the merits, but "[t]hat the court reached these additional conclusions does not undermine the explicit invocation of the procedural bar." *Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir. 2004) (citing *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989)).  The district court nonetheless declined to hold that the claim was procedurally defaulted because Adams did present this issue to the TCCA in his brief on direct appeal.

We need not decide whether the claim is procedurally defaulted, however, because it is easily rejected on the merits.  *Busby*, 359 F.3d at 720 ("Although the question of procedural default should ordinarily be considered first, we need not do so invariably." (citation and internal quotation marks omitted)).  We have previously addressed the same argument and held that the appellate review of death sentences afforded by Texas courts is constitutionally sound.  *Woods v. Cockrell*, 307 F.3d 353, 359–60 (5th Cir. 2002); *Moore v. Johnson*, 225 F.3d 495, 506–07 (5th Cir. 2000).  Adams concedes that this claim is foreclosed by our prior cases and that he raises the issue only to preserve it for possible further review.  Therefore, we affirm the district court's denial of this claim.

## IX.   Unbridled Discretion

Adams's final claim also relates to the third special issue regarding mitigation.  Adams argues that the Texas death penalty statute violates the Eighth and Fourteenth Amendments because it allows the jury "unbridled discretion" to impose the death penalty in answering the mitigation special issue.  The core of Adams's argument is that the mitigation special issue does not provide the jury with any guidance in choosing which mitigating factors they should consider to determine whether there is sufficient mitigating evidence that would warrant the imposition of a life sentence rather than the death penalty.  The TCCA denied this claim because it found that once the jury finds the factors that make the defendant eligible for the death penalty, under *Tuilaepa v.*

*California*, 512 U.S. 967 (1994),  the jury must be given wide discretion not to impose the death penalty.

In *Tuilaepa*, the Supreme Court distinguished between the  two aspects of the capital sentencing decision: the eligibility decision and the selection decision. *Id.* at 971–72.  The Court has already confirmed the constitutionality of Texas's procedure for determining the existence of aggravating circumstances to make the eligibility decision.  *See Jurek v. Texas*, 428 U.S. 262, 276 (1976) (opinion of Stewart, Powell, and Stevens, J.J.); *see also Sonnier v. Quarterman*, 476 F.3d 349, 366–67 (5th Cir. 2007).  In making the selection decision, the jury must be allowed to make "an *individualized* determination" by considering "relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime." *Tuilaepa*, 512 U.S. at 972 (citation omitted). Indeed, the jury "may be given 'unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty.'" *Id.* at 979–80 (quoting *Zant v. Stephens*, 462 U.S. 862, 875 (1983)).  In exercising its discretion, the jury "need not be instructed how to weigh any particular fact in the capital sentencing decision." *Id.* at 979.

The question as posed to the jury asked them to consider the circumstances of the offense, evidence of the defendant's character, evidence of the defendant's background, and the personal moral culpability of the defendant, precisely the considerations mandated by the Court in *Tuilaepa*.  The jury was also instructed that "mitigating evidence" includes "evidence that a juror might regard as reducing the defendant's moral blameworthiness."  Therefore, the jury's decision was based on "an individualized determination on the basis of the character of the individual and the circumstances of the crime," *Tuilaepa*, 512 U.S. at 972 (emphasis omitted), and the TCCA's decision was not an unreasonable application of clearly established federal law, *see Johnson v.*

25

No. 10-70023

*Cockrell*, 306 F.3d 249, 256 (5th Cir. 2002) (denying a COA on a similar contention that the Texas death penalty scheme affords juries "unfettered discretion").

## **CONCLUSION**

For the foregoing reasons, we affirm the district court's judgment denying Adams's petition for a writ of habeas corpus.