W. EUGENE DAVIS, Circuit Judge.*
Petitioner Carlos Trevino was convicted of capital murder in Texas state court and sentenced to death. The district court denied each of Trevino’s eight claims for habeas relief, but granted a certificate of appealability (“COA”) pursuant to 28 U.S.C. § 2258(c) on three of these issues. Trevino now petitions this court to issue COAs authorizing appeal from the district court’s denial of habeas corpus relief regarding the five issues on which the district court denied COA. Because reasonable jurists would not find it debatable that the district court correctly rejected these five claims, we DENY Trevino’s petition for COA regarding these issues. We further address the three issues on which the district court did grant COA. Finding these claims without merit, we AFFIRM the district court’s denial of relief on these grounds.
I.
A.
We summarize the key facts and procedural background recited at length by the district court. Trevino v. Thaler, 678 *417 F.Supp.2d 445, 449-55 (W.D.Tex.2009). The body of 15-year old Linda Salinas was discovered in Espada Park in San Antonio Texas on June 10, 1996. The San Antonio Police Department began an investigation into Salinas’s death. Following the investigation, on April 8, 1997, a Bexar County, Texas grand jury indicted Trevino on a charge of capital murder for intentionally and knowingly causing the death of Linda Salinas by cutting and stabbing her with a deadly weapon while in the course of committing and attempting to commit the aggravated sexual assault of Salinas. Trevino rejected the state’s subsequent plea offer and chose to go to trial.
Testimony at Trevino’s trial established that on the evening of June 9, 1996, he accompanied Santos Cervantes, Bryan Apolinar, Seanido “Sam” Rey, and Juan Gonzales (Trevino’s cousin), on a trip in Apolinar’s car to a store to buy beer for a party they had been attending. Cervantes enticed 15-year old Linda Salinas to get into Apolinar’s car with the assurance Apo-linar would take Salinas to a nearby fast-food restaurant.
Instead of driving to the restaurant, Apolinar drove the group to Espada Park, where Cervantes, Apolinar, and Rey sexually assaulted Salinas while she unsuccessfully struggled to escape. Gonzales testified as the prosecution’s key witness regarding the following: (1) Gonzales saw Trevino hold Salinas down while Rey raped her; (2) at one point, Trevino urged Gonzales to rape Salinas, but Gonzales refused; (3) Gonzales overheard Apolinar, Cervantes, and Trevino discuss their mutual desire not to leave any witnesses behind; (4) Gonzales heard Rey say “we don’t need no witnesses” and heard Cervantes repeat the same comment, then heard Trevino reply “we’ll do what we have to do”; (5) at that point, Gonzales returned to the group’s vehicle; (5) 'when the others returned, Gonzales noticed that Cervantes and Trevino had blood on their shirts.
Gonzales further testified that following the incident, during the group’s ensuing drive away from the scene, Cervantes made a comment that it was “neat” or “cool” about how Trevino had “snapped” Salinas’s neck, and also made a comment about a knife. Trevino responded with the comments “I learned how to kill in prison” and “I learned how to use a knife in prison.” Gonzales also testified that, after the incident, Trevino told Gonzales not to say anything to the police. Further, Gonzales testified that when he asked Cervantes why he killed the girl, Cervantes responded “mind your own business.” Gonzales additionally testified that while he never saw Trevino or anyone else with a knife at the scene of the murder, Gonzales had seen Cervantes with a knife a few days before Salinas’s murder and, two days after the murder, Cervantes told Gonzales he had broken the knife and thrown it into a river.
Salinas’s body was discovered in Espada Park the day after the murder. According to expert testimony at Trevino’s trial, an autopsy revealed (1) Salinas suffered two stab wounds to the left side of her neck, one of which was fatal; (2) Salinas sustained soft tissue damage in her vaginal area and at her anal opening; (3) Salinas sustained no internal injuries to her neck other than those caused by the two stab wounds, and there was no physical evidence anyone had attempted to “snap” her neck; and (4) there were scratches on Salinas’s legs and fresh bruises on her breasts.
Other evidence during the guilt/innocence phase of Trevino’s trial included testimony from forensic and DNA experts establishing (1) the examination of a pair of blue women’s shorts and a pair of white *418 women’s panties found at the crime scene, both identified by Linda Salinas’s mother as belonging to Linda, revealed the presence of polyester and cotton fibers which were consistent with a pair of slacks owned by Trevino; and (2) a blood stain found on Linda Salinas’s white panties contained a mixture of the DNA from at least two persons, with DNA testing eliminating as possible sources of the DNA all but Salinas and Trevino from among those identified by Gonzales as present at the scene.[1]
The jury returned a guilty verdict. During the punishment phase of trial, the prosecution presented evidence regarding Trevino’s culpability and future dangerousness, including his former arrests and his admitted membership in a violent street gang. As mitigating evidence, the defense presented Trevino’s aunt, who testified generally that she knew Trevino to be a good person and that he had experienced certain difficulties in his life, including the absence of his father and his mother’s alcohol problems.
The jury returned its verdict at the punishment phase of trial, finding (1) that Trevino would commit criminal acts of violence in the future which would constitute a continuing threat to society; (2) Trevino actually caused the death of Linda Salinas or, if he did not actually cause her death, he intended to kill her or another, or he anticipated a human life would be taken; and (3) there were insufficient mitigating circumstances to warrant a sentence of life imprisonment. In accordance with the jury’s verdict, the state trial court imposed a sentence of death.
Trevino directly appealed his conviction and sentence, asserting 19 claims for relief. The Texas Court of Criminal Appeals affirmed his conviction and sentence. Trevino v. State, 991 S.W.2d 849 (Tex.Crim.App.1999). While his direct appeal was still pending, Trevino filed an application for state habeas corpus relief in which he urged 46 grounds for relief. The state habeas trial court held an evidentiary hearing during which Trevino’s former trial counsel testified in part that (1) the defense contacted Gonzales prior to trial and knew what testimony he would give; (2) Trevino never denied participating in the offense and admitted he was present when Salinas was killed; (3) when defense counsel pressed Trevino about the facts of the offense, Trevino responded he was too stoned at the time of the offense to recall details; and (4) Trevino never denied saying “I learned to kill in prison.” The state habeas trial court denied the habeas corpus application. The Texas Court of Criminal Appeals adopted the state habeas trial court’s findings and conclusions and denied Trevino’s state habeas corpus application. Ex parte Carlos Trevino, WR-48,153-01 (Tex.Crim.App. April 4, 2001).
On March 14, 2002, Trevino filed his original petition for federal habeas corpus relief in the district court, asserting four claims for relief. He subsequently filed, and the district court granted, an unopposed motion for stay, seeking leave to return to state court and explore a potential mental retardation claim, as well as other unexhausted claims.
Trevino then filed his second state habe-as corpus application, asserting new claims that (1) his trial counsel rendered ineffective assistance by failing to adequately investigate, develop, and present available mitigating evidence during the punishment *419 phase of trial; and (2) the Supreme Court’s holding in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 158 L.Ed.2d 335 (2002) precludes his execution because he suffers from fetal alcohol syndrome. The Texas Court of Criminal Appeals dismissed Trevino’s second state habeas corpus application pursuant to the Texas writ-abuse statute in an unpublished, per cu-riam order. Ex parte Carlos Trevino, WR-48, 153-02, 2005 WL 3119064 (Tex. Crim.App. November 23, 2005).
Thereafter, Trevino filed, and the district court granted, another motion for stay in which Trevino sought to return to state court and exhaust a new claim based on his federal habeas counsel’s discovery in the state’s files of a written witness statement dated June 12, 1996 given by Rey indicating that Cervantes, not Trevino, stabbed the victim.
Trevino then filed a motion for appointment of counsel in state court, seeking legal representation in connection with this new claim. However, for over two years the state judicial officers either failed or refused to appoint counsel for Trevino to pursue this claim, despite entreaties from the district court. The district court then lifted the stay and federal proceedings resumed.
B.
On December 8, 2008, Trevino filed his amended petition for federal habeas corpus relief, in which he asserted eight claims for relief. The district court denied relief on all claims, but granted COA on three of these claims. Trevino now appeals the district court’s rejection of those three claims. Trevino also seeks COAs to authorize appeal of the claims on which the district court denied COA.
Trevino’s primary assertion in the current appeal is that prosecutors failed to disclose Rey’s June 12, 1996 written statement which suggested that Santos Cervantes stabbed Salinas and that this nondisclosure violated Trevino’s constitutional rights pursuant to Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
The record evidence indicates that this June 12, 1996 statement was the second of three signed, written statements Rey gave to police on June 12 and 13, 1996 during the investigation of Salinas’s death. A report created by Detective Charles Gresham summarized all of the witness statements made during the investigation, including Rey’s three statements.
In his first statement made on June 12, 1996, Rey essentially denied any involvement in the crime. Gresham’s report accurately summarizes this first statement. When Gresham confronted Rey with contradictory testimony from witnesses, Rey made a second statement the same day. In the pertinent part of this second statement, Rey stated that he and his friends drove with the victim from the store to Espada Park where Santos Cervantes took the victim into the woods by himself and then returned alone about 15 minutes later. According to Gresham’s summary, when Rey asked Santos Cervantes where the girl was, “Santos told him he killed her.” The full written statement is lengthier and includes more detail. This second statement forms the basis for Trevino’s Brady claim on this petition.
On June 13, 1996, Gresham obtained arrest warrants for Rey and Trevino. After being taken into custody, Rey made a third signed, written statement to the police on June 13. This third statement reads in pertinent part as follows:
This is the third statement I have given to the police. Everything I have said in my second statement about how the girl Linda ended up in the car is true.... *420 We got to the park. Santos [Cervantes] and the girl got out of the car and went down the hill. I stayed on the top of the hill where we parked the car. Me, Bryan [Apolinar], Thate [Gonzales], and Carlos [Trevino] stayed with the car for about five minutes. All of use went down to where Santos [Cervantes] was. When I got to where Santos [Cervantes] and Linda were Linda had he[r] pants down to her ankles and her shirt was up. I could see her breasts she did not have her bra on.... Santos [Cervantes] was having sex with Linda.... After Santos [Cervantes] finished, I think Carlos [Trevino] had sex with her. Carlos [Trevino] had sex with her about ten seconds. I had sex with Linda next. I only went about ten seconds. After me Thate [Gonzales] had sex with Linda. He went about ten seconds. Bryan [Apolinar] had sex with Linda next he went about a minute. Santos [Cervantes] had sex with Linda again. Carlos [Trevino] and Bryan [Apolinar] at the same time told me and Thate [Gonzales] to go up and look out. Santos [Cervantes] was still having sex with Linda. Up to this point I did not see anyone hit Linda. No one yelled at her that I know of. Thate [Gonzales] and me went back up the hill to the car. Thate [Gonzales] and me got in the car. We both got in the back. They were down there about five minutes, Santos [Cervantes], Bryan [Apolinar] and Carlos [Trevino]. Thate [Gonzales] and me were wondering what was taking so long. All three of them came up the hill. I asked what happened Carlos [Trevino] said they killed her that they cut her throat. Santos [Cervantes] said they cut her throat, we killed her[J I asked how they said we cut her throat. Carlos [Trevino] said don’t tell anybody. Carlos [Trevino] started to brush his shoes off with his hand, I saw they had blood on them.
(underlined emphasis added). Gresham’s report included an accurate summary of Rey’s third statement. The summary contained the following description of the most relevant part of Rey’s third statement:
Seanido [Rey] stated Santos [Cervantes], Bryan [Apolinar], and Carlos [Trevino] then returned to the car and when he asked Carlos [Trevino] what had happened he was told they had cut her throat. He reported he observed Carlos [Trevino] brushing his shoes off with his hand and he could see there was blood on them.[2]
*421 Following the trial of this case, Rey pleaded guilty to murder and is currently serving a 50-year sentence. In connection with his guilty plea, Rey stipulated to the facts contained in Gresham’s police report and his witness statements, all three of which were attached to his stipulation. See State v. Rey, No. 97-CR-1717C (290th Dist. Ct., Bexar County, Tex. Mar. 25, 1998) (factual stipulations and attached exhibits).[3]
At some point during the instant action, Trevino’s federal habeas counsel discovered Rey’s second June 12, 1996 written statement. The full, signed statement had been kept in one of the state’s separate files and, thus, had not been previously turned over to Trevino’s lawyers. Nevertheless, the original prosecutors in Trevino’s case have provided affidavits in connection with this action asserting that they provided Trevino’s trial counsel with a copy of Gresham’s entire report before trial, including Gresham’s summary of Rey’s three statements. Trevino’s two trial attorneys, Gus Wilcox and Mario Trevino, have provided counter-affidavits stating that they do not recall ever seeing Gresham’s summaries of Rey’s statements.
However, the record of Trevino’s first state habeas proceeding is inconsistent with the affidavits of Trevino’s attorneys. During that proceeding, Wilcox and Mario Trevino both gave testimony strongly suggesting that they had evaluated the witness statements in Gresham’s report. Mario Trevino testified that he had been given access to statements of the prosecution’s potential witnesses, as well as various police reports, and that he was aware of at least “two guys that gave statements that were pointing the finger to Mr. Trevino.” Wilcox went further and testified that because he knew that all of the state’s potential witnesses would inculpate Trevino, Wilcox had adopted a trial strategy of not calling any witnesses while instead relying on cross-examination in an attempt to create a reasonable doubt. The potential witness list that prosecutors provided to Trevino’s attorneys prior to trial included Rey.[4]
*422 On this petition, Trevino relies on Rey’s second written statement to argue that if that statement had been disclosed, the defense could have shown that Cervantes, rather than Trevino, killed the victim. Trevino asserts that the alleged nondisclosure of the entire written statement had a prejudicial effect at both the guilt and sentencing stages of his trial in violation of his rights under Brady.
Trevino has also raised various other claims, including a claim that his trial counsel failed to effectively investigate and present available mitigating information during the sentencing phase of Trevino’s trial. As discussed further below on a claim-by-claim basis, the district court rejected each of Trevino’s claims for relief.
II.
Under the Antiterrorism and Effective Death Penalty Act (“AEDPA”), “[bjefore an appeal may be entertained, a prisoner who was denied habeas relief in the district court must first seek and obtain a COA....” Miller-El v. Cockrell, 537 U.S. 322, 335, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C. § 2253(c)(1). Trevino is entitled to a COA only if he can make “a substantial showing of the denial of a constitutional right.” Miller-El, 537 U.S. at 336, 123 S.Ct. at 1039 (citing § 2253(c)(2)). To meet this standard, Trevino must demonstrate “that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that issues presented were adequate to deserve encouragement proceed further.” Id. (internal quotations and citations omitted); accord Tennard v. Dretke, 542 U.S. 274, 288, 124 S.Ct. 2562, 2572, 159 L.Ed.2d 384 (2004).
In making a COA inquiry, we must consider that AEDPA required the district court to defer to the state court’s resolution of Trevino’s claims, except in limited circumstances. Foster v. Quarterman, 466 F.3d 359, 365 (5th Cir.2006). Under AED-PA, federal courts may not grant habeas relief with respect to a claim adjudicated on the merits in state court unless that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d)(1) — (2); see also Penry v. Johnson, 532 U.S. 782, 792, 121 S.Ct. 1910, 1918, 150 L.Ed.2d 9 (2001). We “must presume that the state court’s factual findings are correct unless [Trevino] meets his burden of rebutting that presumption by clear and convincing evidence.” Reed v. Quarterman, 555 F.3d 364, 368 (5th Cir. 2009) (citing 28 U.S.C. § 2254(e)(1)).
*423 “[A]bsent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief.” Orman v. Cain, 228 F.3d 616, 619-20 (5th Cir.2000); 28 U.S.C. § 2254(b)(1). Special circumstances permitting federal courts to review a claim before it has been exhausted in state court include (1) when there is an absence of available state corrective process; or (2) when circumstances exist that render such process ineffective to protect the federal habeas petitioner’s rights. 28 U.S.C. § 2254(b)(l)(B)(i)-(ii).
In reviewing an issue on which the district court granted COA, “we review the district court’s findings of fact for clear error and its conclusions of law de novo, applying the same standards to the state court’s decision as did the district court.” Busby v. Dretke, 359 F.3d 708, 713 (5th Cir .2004).
III.
We first address the five issues on which the district court denied COA.
A.
Trevino first argues that the state violated his constitutional rights under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) by failing to disclose Key’s second written statement dated June 12, 1996. He contends that had the state properly disclosed this statement, he likely could have established reasonable doubt regarding his guilt.
Because the state courts never effectively addressed the merits of this issue or dismissed it as procedurally defaulted, the district court reviewed this claim de novo pursuant to 28 U.S.C. § 2254(b)(1).[5] The district court determined that unresolved questions of fact exist as to whether the government suppressed or properly disclosed Rey’s statement, but concluded that the statement did not meet Brady’s materiality requirement with regard to the guilt/innocence phase of the trial. On our own de novo review, we agree with the district court regarding the statement’s lack of materiality.
There are three basic elements to a Brady claim: (1) the evidence must be favorable to the accused, either because it is exculpatory or because it may be used as impeachment evidence; (2) the evidence must have been suppressed by the state; and (3) the evidence must be “material.” Banks v. Dretke, 540 U.S. 668, 691, 124 S.Ct. 1256, 1272, 157 L.Ed.2d 1166 (2004). Evidence is “material,” i.e., prejudicial, when there exists a “reasonable probability” that had the evidence been disclosed the result at trial would have been different. Banks, 540 U.S. at 698-99, 124 S.Ct. at 1276; see also Miller v. Dretke, 404 F.3d 908, 913-16 (5th Cir.2005).
1.
As an initial matter, although the district court did not resolve the factual is *424 sues surrounding whether the state suppressed Rey’s second written statement, the record evidence strongly indicates that the prosecution did not suppress the statement.[6] Given the evidence discussed above indicating that the prosecution disclosed Gresham’s accurate summary of Rey’s three statements to Trevino’s attorneys prior to trial, this should have put defense counsel on notice that Rey had made one statement to police suggesting that Cervantes stabbed the victim. The onus was then on Trevino’s lawyers to request a copy of the full statement. See generally Rector v. Johnson, 120 F.3d 551, 558 (5th Cir.1997) (failure to discover material evidence must not be the result of the lack of due diligence). Regardless, even assuming that the state failed to properly disclose Rey’s second written statement, this statement does not meet the requisite standard of materiality for the following reasons.
2.
In light of Rey’s third written statement to the police inculpating Trevino in Salinas’s murder, it is indisputable that Rey’s second written statement was immaterial to Trevino’s case. If Trevino’s lawyers had been successful in introducing Rey’s second statement[7] to suggest that Cervantes was solely responsible for Salinas’s murder, the prosecution undoubtedly would have introduced Rey’s third statement.[8] Introduction of Rey’s third statement would have destroyed any benefit Trevino would have otherwise gained from the second statement. Not only does Rey’s third statement expressly retract his second statement’s assertion that Cervantes took Salinas to the woods by himself, Rey’s third statement plainly describes Trevino’s active participation in Salinas’s rape and murder. Rey’s third statement contains the following testimony: (1) Trevino raped Salinas; (2) Trevino, Cervantes, and Apolinar were present when Salinas was killed; (3) when Trevino, Cervantes, and Apolinar returned to the car without Salinas, Rey “asked what happened [and] Carlos [Trevino] said they killed her that they cut her throat”; (4) Trevino had blood on his shoes; and (5) Trevino said “don’t tell anybody.”
In the extremely unlikely event that Rey had attempted to testify at Trevino’s trial to the facts contained in his second statement, the prosecution would have undoubtedly impeached Rey with his third statement to the police. Accordingly, it is very clear that even if Trevino’s counsel had been permitted to use Rey’s second written statement at trial, this would have failed to benefit Trevino. To the contrary, admission of Rey’s written statements would have been extremely damaging to Trevino’s interests.
*425 Under these circumstances, Rey’s second written statement cannot be considered material because there is not a “reasonable probability” that the outcome of Trevino’s trial would have been different if the full statement had been disclosed. In fact, quite the opposite is true — it is almost certain that the outcome would have been the same.
3.
Additionally, we note our agreement with the district court that the evidence presented at Trevino’s trial supports the jury’s verdict of conviction under Texas’s law of the parties.[9] As explained, Rey’s written statements cast no doubt on the substantial, uncontroverted evidence presented during the guilt/innocence phase of the trial supporting the conclusion that Trevino acted with intent to commit the offense and aided or attempted to aid other members of the group in commission of Salinas’s murder. Rey’s third written statement is consistent with the trial evidence. There is no reasonable probability that but for the alleged failure of the prosecution to disclose Rey’s second written statement, the jury would have found Trevino not guilty of capital murder under Texas’s law of the parties.
Jurists of reason cannot find the district court’s denial of Trevino’s Brady claim on these grounds debatable. See Miller, 404 F.3d at 916 (denying COA in capital murder case regarding suppression of evidence that defendant had not shot the victim because “uncontroverted, overwhelming evidence” showed that defendant participated in the crime and was, thus, guilty under Texas’s law of the parties). We, therefore, affirm the district court’s denial of a COA on this issue.
B.
We next turn to Trevino’s request for COA regarding the district court’s denial of his claim for ineffective assistance of counsel during the guilt/innocence phase of trial based on his counsel’s failure to discover Rey’s second written statement. It is clear that this argument fails for the same reasons described above.
To prove ineffective assistance of counsel, Trevino must generally show (1) that his counsel’s performance was deficient; and (2) that this deficiency prejudiced the defendant. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2059, 80 L.Ed.2d 674 (1984). Trevino cannot show prejudice based on his counsel’s failure to uncover Rey’s second written statement for the same reasons that he cannot show that the statement was material under Brady. The record evidence suggests, moreover, that because Trevino’s attorneys had access to Gresham’s accurate summaries of all three of Rey’s witness statements, they appreciated the import of Rey’s third statement. The record demonstrates that Trevino’s attorneys reasonably believed all of the state’s potential witnesses — including Rey — would inculpate Trevino if called to testify. This is why *426 Trevino’s attorneys did not attempt to call Rey or any other witnesses. Nothing in the record remotely suggests that disclosure of the full text of Key’s second written statement would have changed this strategic calculation made by Trevino’s attorneys, particularly in light of Re/s third statement. Jurists of reason cannot debate the district court’s conclusion on this issue. Therefore, we affirm the district court’s denial of a COA regarding this issue.
C.
We next consider Trevino’s argument that a COA should issue regarding the district court’s rejection of Trevino’s claim that his trial counsel failed to investigate and develop mitigating evidence during the sentencing phase of trial. The district court held that this claim was procedurally defaulted because Trevino failed to raise it during his first state habeas proceeding, which resulted in dismissal by the Texas Court of Criminal Appeals on the basis of Texas’s “abuse of the writ” doctrine when Trevino presented the issue in his second state habeas suit. See Texas Code of Crim. P. Ann. Art. 11.071 § 5(c) (2011).
A claim is procedurally defaulted when a state court clearly and expressly bases its dismissal of a claim on a state procedural rule and that rule provides an independent and adequate ground for dismissal. Coleman v. Thompson, 501 U.S. 722, 729, 111 S.Ct. 2546, 2553-54, 115 L.Ed.2d 640 (1991). When such a dismissal based on independent and adequate state law grounds has occurred, we do not reach the merits of the federal habeas claim. Id.
The district court rightly observed that we have expressly held “Texas’s abuse of the writ doctrine is a valid state procedural bar foreclosing federal habeas review.” Coleman v. Quarterman, 456 F.3d 537, 542 (5th Cir.2006); accord Hughes v. Quarterman, 530 F.3d 336, 342 (5th Cir.2008). Moreover, we recently addressed a “perfunctory” dismissal order by the Texas Court of Criminal Appeals — similar to the order dismissing Trevino’s second state habeas petition — that cited Article 11.071, Section 5 of the Texas Code of Criminal Procedure in dismissing a claim for ineffective assistance of counsel, without further explanation. Balentine v. Thaler, 626 F.3d 842, 849-57 (5th Cir.2010) (panel rehearing). We held that this dismissal order could not be read as having reached the merits of the federal claim, but rather must be viewed as resting on independent and adequate state law grounds for purposes of procedural default. Id. Accordingly, we agree with the district court that Trevino’s claim for ineffective assistance of counsel, which the Texas Court of Criminal Appeals dismissed on abuse-of-writ grounds under Section 5 of Article 11.071 of the Texas Code of Criminal Procedure, was dismissed on independent and adequate state grounds and is, thus, procedurally defaulted. Reasonable jurists cannot disagree with the district court’s procedural ruling in this regard. We, therefore, affirm the district court’s denial of COA for this claim.[10]
D.
We also affirm the district court’s denial of COA regarding Trevino’s claim that the factors in Texas’s capital sentencing scheme — such as “future dangerousness” — are vaguely defined and fail to properly channel the jury’s discretion. As *427 the district court correctly held, we have repeatedly rejected similar arguments. See, e.g., Leal v. Dretke, 428 F.3d 543, 553 (5th Cir.2005) (citing numerous cases rejecting vagueness challenges to the terms of Texas’s capital sentencing scheme). Because jurists of reason cannot debate that the district court correctly held that this claim has no merit under binding precedent, we affirm the district court’s denial of a COA.
E.
Finally, we affirm the district court’s denial of a COA regarding Trevino’s argument that Texas procedure unconstitutionally prevented the trial court from informing the jury of the effect of a hung jury during Trevino’s sentencing. The district court noted first that Trevino raised this same claim during his direct appeal in state court and during his first state habe-as proceeding; the Texas courts rejected the claim. The district court also correctly explained that the Supreme Court and this court have rejected similar claims numerous times. See Jones v. United States, 527 U.S. 373, 382, 119 S.Ct. 2090, 2098, 144 L.Ed.2d 370 (1999) (holding that the Eighth Amendment does not require a capital sentencing jury to be instructed regarding the effect of a “breakdown in the deliberative process”).[11] Reasonable jurists cannot debate the district court’s disposition of this issue. Thus, we affirm the district court’s denial of a COA on this ground.
IV.
We next consider the three claims on which the district court granted COA.
A.
The district court granted COA on Trevino’s Brady claim regarding the prosecution’s alleged suppression of Rey’s second written statement during the punishment phase of his trial. Trevino argues that had the prosecution disclosed Rey’s second written statement, it is reasonably probable that the jury would not have sentenced him to death. For substantially the same reasons that we reject this claim with regard to the guilt/innocence phase of trial, we hold that the government’s alleged suppression of Rey’s second -written statement was not material to the punishment phase of Rey’s trial under Brady.
Admission of Rey’s written statements at the sentencing phase of trial would not have tended to prove that Trevino lacked culpability in the stabbing death of Salinas. As explained, Rey contradicted all of the salient facts of his second written statement in the third written statement he made to the police after his arrest. Subsequently, Rey pleaded guilty to Salinas’s murder, stipulating to the truth of his third statement. Whatever probative value the second written statement may have had, therefore, was negated by Rey’s third statement and, later, by his guilty plea. As such, a reasonable jury could not have given Rey’s second statement any credence during sentencing.
Accordingly, Rey’s second written statement was not material to Trevino’s sentence because there is no “reasonable probability” that the prosecution’s disclosure of the statement would have changed the outcome of the sentencing phase of Trevino’s trial.
*428 B.
The district court granted COA regarding Trevino’s claim that he received ineffective assistance of counsel based on his trial attorneys’ failure to discover and present Rey’s second written statement during the sentencing phase of trial. Trevino argues that such failure meets the standard for prejudice established by the Supreme Court. See Strickland, 466 U.S. at 687, 104 S.Ct. at 2064. This claim has no merit for the reasons stated above. The record evidence clearly shows that Rey’s second statement had no materiality and that, accordingly, Trevino’s attorneys’ alleged failure to seek out the full statement and attempt to present it to the jury did not prejudice Trevino’s interests during sentencing under the meaning of Strickland.
C.
Finally, the district court granted COA regarding Trevino’s claim that it would be a “fundamental miscarriage of justice” if Trevino were not permitted to pursue his claim that his trial counsel failed to investigate and present compelling mitigating evidence at the sentencing phase of trial. As explained above, we agree with the district court that Trevino’s ineffective-assistance claim regarding his counsel’s alleged failure to discover and use “new,” potentially mitigating evidence is procedurally barred under Texas’s abuse-of-writ doctrine. Thus, the only issue on which the district court granted COA is whether Trevino’s claim qualifies for the narrow exception to the prohibition on habeas review of procedurally barred claims when there exists a “fundamental miscarriage of justice.” Coleman v. Thompson, 501 U.S. 722, 749-50, 111 S.Ct. 2546, 2564-65, 115 L.Ed.2d 640 (1991).
To satisfy the “miscarriage of justice” test, a petitioner must supplement his constitutional claim with a colorable showing of “actual innocence.” Sawyer v. Whitley, 505 U.S. 333, 335-36, 112 S.Ct. 2514, 2519, 120 L.Ed.2d 269 (1992). In the context of the sentencing phase of a capital murder trial, the Supreme Court has held that a showing of actual innocence is made when a petitioner shows by clear and convincing evidence that, but for constitutional error, no reasonable juror would have found petitioner eligible for the death penalty under applicable law. Id. at 346-48, 112 S.Ct. at 2523. This “actual innocence” inquiry, thus, must be carefully focused on mitigating evidence related to the legal factors that render a capital defendant eligible for a death sentence. Rocha v. Thaler, 619 F.3d 387, 405 (5th Cir.2010). We recently explained this actual-innocence inquiry at length:
When a claim of actual innocence contests a sentence of death, the habeas petitioner’s claim must tend to negate not just the jury’s discretion to impose a death sentence but the petitioner’s very eligibility for that punishment. That is, a habeas petitioner who is unquestionably eligible for the sentence received can never be actually innocent of the death penalty. This is so because late-arriving constitutional error that impacted only a jury’s sentencing discretion is not sufficiently fundamental as to excuse the failure to raise it timely in prior state and federal proceedings. The actual innocence requirement must, then, focus on those elements that render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error.
Id. at 405 (internal quotations and citations omitted). Thus, if a defendant is eligible for the death penalty, the actual-innocence inquiry does not take into account the *429 entire universe of potential mitigating evidence that a defendant may seek to present that could have affected a jury’s discretion to impose the death penalty. Id.[12]
The “new” mitigating evidence on which Trevino relies relates primarily to his difficult, abusive childhood and his struggles with alcohol and illegal substances.[13] The subject matter of this evidence is somewhat cumulative of the testimony of Trevino’s aunt, who testified that Trevino had experienced difficulties involving the absence of his father and his mother’s alcohol problems. But the volume of new evidence identified by Trevino is much greater than what was presented by his trial attorneys. Notwithstanding the volume of this potentially mitigating evidence or the effect it might have had on the jury’s sympathies, this evidence does not satisfy the demanding standard of “actual innocence” because it bears no relationship to Trevino’s eligibility for the death penalty.
The evidence presented during the guilt/innocence phase of trial, combined with the evidence presented during the sentencing phase, rendered Trevino legally eligible for the death penalty. Trevino became eligible for the death penalty during the sentencing phase on the jury’s affirmative answer to the special question asking whether Trevino represented a continuing threat to society. See Tex.Code Crim. P. art. 37.071 § 2(b) (2011).[14] The potential mitigating evidence Trevino discusses would have had no appreciable effect on the jury’s decision regarding this future dangerousness question.
Ample evidence was presented during the guilt/innocence phase of trial entitling the jury to determine that Trevino represented a continuing threat to society. Much of the testimony arrayed against Trevino indicated future dangerousness, including Gonzales’s testimony that Trevino made callous, menacing comments following Salinas’s murder such as “I learned how to use a knife” and “I learned how to kill in prison.” The prosecution also presented additional evidence regarding Trevino’s future dangerousness such as Trevino’s past convictions for various crimes, *430 including unlawful possession of a handgun; his membership in a notorious street gang; and tattoos indicating that he closely identified himself with this gang.
None of the new mitigating evidence Trevino discusses — which relates primarily to the circumstances of his childhood— would have been relevant to the jury’s consideration of Trevino’s future threat to society. As the district court pointed out, if anything, this type of mitigating evidence is “double-edged,” in that it could just as easily be interpreted to support the conclusion that Trevino represents a future danger as it could be interpreted to undermine such a conclusion.
Furthermore, Trevino’s argument that this new mitigating evidence would have rendered him ineligible for the death penalty pursuant to the jury’s second special question at the sentencing phase is without merit. In Texas’s capital sentencing scheme, the second special question permits the jury to make an individualized determination of the defendant’s moral culpability by considering the circumstances of his offense as well as his character and background. See Tex.Code Crim. P. art. 37.071 § 2(e)-(f) (2011). This question implicates the jury’s discretion to impose the death penalty and, thus, is viewed as a “selection” issue rather than an “eligibility” issue in the parlance of the Supreme Court’s death-penalty jurisprudence. See Tuilaepa, 512 U.S. at 971-73, 114 S.Ct. at 2634-35. As with other “actual innocence” claims that we have rejected, Trevino’s argument simply “reduces to an assertion that mitigating evidence could have influenced the jury’s discretion in considering a sentence of death; he does not argue that this evidence would have rendered him ineligible for the death penalty.” Rocha, 619 F.3d at 405.[15]
Accordingly, Trevino fails to satisfy the actual-innocence standard. The “fundamental miscarriage of justice” exception to the prohibition against habeas review of procedurally barred claims, therefore, does not apply to Trevino’s claim regarding ineffective assistance of counsel.
V.
For the foregoing reasons, we conclude that a COA is not warranted for any of the five issues that Trevino has raised on this petition; moreover, the district court correctly denied relief on the three claims on which the district court granted COA. Accordingly, we AFFIRM the district court’s order denying habeas relief to Trevino.

 Pursuant to 5th Cir. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

. The state's expert testified that 1 of every 2,684 members of the southwestern United States Hispanic population has the same DNA profile identified on the panties and that the DNA evidence did no more than rule out as possible sources of the blood the other individuals present at the scene except for Trevino and Salinas.

. According to Gresham's report, Rey's third statement was largely consistent with Apoli-nar and Cervantes’ statements. Gresham summarized Apolinar’s statement as follows:
Bryan [Apolinar] reported Carlos [Trevino] started jerking on her and he could tell he was trying to break her neck. Bryan [Apo-linar] stated at this time he couldn’t handle it any more and he walked back to the car. He stated about a minute later they all come back up the slope except Linda [Salinas] and he could see Carlos [Trevino] had blood all over him that he was wiping off with a shirt. Bryan [Apolinar] stated he could also see Carlos [Trevino] had a knife that he was also wiping off and that no one else had blood on them.
Apolinar was convicted of sexually assaulting Salinas. In upholding Apolinar’s conviction, the Texas Court of Appeals took note of Apolinar’s statement that he witnessed Trevino “stab the victim.” Apolinar v. Texas, No. 04-99-00644-CR, 2000 WL 1210922, *1 (Tex. Ct.App. Aug. 16, 2000) (unpublished).
Cervantes pleaded guilty to Salinas’s murder. Gresham's summary of Cervantes's statement contains a similar description of the crime:
He reported he then see Carlos [Trevino] grab up Linda and he had her by the neck with both arms and was pushing with them. Santos [Cervantes] stated Carlos [Trevino] put her down and Sam [Rey] put his foot on her neck and told her ‘don’t move bitch.' Santos [Cervantes] stated he could hear *421 gurgling noises coming from Linda while this was going on. He stated he then saw Sam [Rey] move his foot and Carlos [Trevino] grabbed Linda [Salinas] up by the hair and stabs her twice.

. This appeal has been complicated by the fact that Trevino’s counsel placed Rey’s second written statement into the record, but Rey’s third written statement inexplicably does not appear in the record on appeal. The district court, therefore, did not have the benefit of reviewing Rey's third written statement. Nevertheless, all three of Rey's signed, written statements appear in the record of Rey’s murder case in Bexar County district court. The existence and the content of these statements are beyond dispute and, moreover, our review of Trevino's Brady claim is de novo. Therefore, we take judicial notice of Rey’s third written statement. See Brown v. Lippard, 350 Fed.Appx. 879, 883 n. 2 (5th Cir.2009) (taking judicial notice of state courts records outside the record on appeal). This is consistent with our routine practice in habeas appeals of taking judicial notice of all related proceedings brought by the appellant, including state proceedings, "even when the prior state case is not made a part of the record on appeal.” See Moore v. Estelle, 526 F.2d 690, 694 (5th Cir. 1976). If we failed to take judicial notice of Rey’s third written statement, the court's understanding of the record evidence would be incomplete. See id. ("For a proper understanding of protracted litigation we may draw upon the records of all the preceding cases.”). Because Trevino has not had an opportunity to have input into our decision to take judicial notice of documents in the state court proceedings involving Rey, we afford him the right to raise any objection he may have by means of a petition for rehearing, which objection we will consider filed before our opinion issued.

. The following exchange with Wilcox took place at the state habeas proceeding:
Q. [W]hat theory of or what defensive posture did you decide to take in front of the jury at guilt/innocence?
*422 A. Well, I think what we were hoping to be able to somehow to do, is somehow show that he was merely present and did nothing to commit the crime.
Q. In order to do it through a witness, you would have had to call one of the State's potential witnesses, right?
A. Well, right. That's part of the problem. So, I mean, I was going to — We would try and develop that through cross-examination at best, really. That’s what we were going to have to do.
Q. Because, correct me if I’m wrong, but if you would have called any of those witnesses, they would have put your client at the scene, right?
A. That’s right.
Q. And hence corroborated the witnesses called by the State; correct?
A. Well, yeah.
Q. So you made a strategic decision to try to present a case of reasonable doubt through the cross examination of the State’s witnesses?
A. That’s basically it.

. The district court explained that when Trevino’s federal habeas counsel discovered Rey's statements, the district court stayed its proceedings to allow Trevino to pursue the Brady claim in state court. The state authorities, however, failed or refused to appoint counsel for Trevino, despite explicit entreaties from the district court. The district court held that the state’s failure or refusal to appoint counsel rendered the state process "ineffective” to protect Trevino’s constitutional rights, pursuant to 28 U.S.C. § 2254(b)(1), thus permitting the district court to review the claim without it having first been adjudicated in state court. See Trevino, 678 F.Supp.2d at 458. We agree that, under the circumstances, the district court was authorized under 28 U.S.C. § 2254(b)(1) to review the claim de novo.

. The state argued that Rey’s written statement was available to the defense under the state's "open-file” policy. The district court held that it need not resolve the factual issues regarding whether the state had suppressed the statement given the district court's conclusion that the statement was not material.

. Rey's second written statement would likely have been inadmissible hearsay. See Fed. R.Evid. 801(c); Tex.R. Evid. 801(d). In this circuit, inadmissible evidence may be material under Brady if it somehow leads to other exculpatory evidence; the key is still "whether the disclosure of the evidence would have created a reasonable probability that the result of the proceeding would have been different.” Felder v. Johnson, 180 F.3d 206, 212 (5th Cir.1999).

.See, e.g., Fed.R.Evid. 806 ("When a hearsay statement ... has been admitted in evidence,” the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness ....); accord Tex.R. Evid. 806

. Such law, according to the instruction given to the jury, provides, inter alia, the following:
[A] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, or by the conduct of another for which he is criminally responsible, or both. Each party to an offense may be charged with commission of the offense ... A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense he solicits, encourages, directs, aids or attempts to aid the other person to commit the offense.
See Trevino, 678 F.Supp.2d 445 (quoting and explaining the instructions given to the jury regarding Texas’s law of parties); see also Tex. Penal Code § 7.02 (2011).

. The district court granted COA on the issue of whether Trevino could meet the "fundamental miscarriage of justice” exception to the procedural default of his ineffective-assistance claim, and we will address that issue separately below.

. See also Turner v. Quarterman, 481 F.3d 292, 300 (5th Cir.2007) (recognizing that precedent precludes any argument that the Eighth Amendment or the Due Process clause of the Fourteenth Amendment requires a Texas capital sentencing jury to be informed of the effect of failure to reach a unanimous verdict).

. See also Haynes v. Quarterman, 526 F.3d 189, 195 (5th Cir.2008) (“The ‘actual innocence’ requirement must focus on those elements that render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being introduced as a result of claim of constitutional error.”).

. As described by the district court, this "new” mitigating evidence can be summarized as follows:
(1) the petitioner's mother was an emotionally unstable, physically abusive alcoholic who abused alcohol throughout her pregnancy with petitioner; (2) petitioner weighed only four pounds at birth and required considerable hospital care during his first few weeks of life; (3) for the rest of his life, petitioner suffered from the deleterious effects of Fetal Alcohol Syndrome, as well as his mother's physical and emotional abuse; (4) petitioner suffered numerous serious head injuries as a child for which he received little or no medical care due to the neglect of his mother and the absence of his father; (5) petitioner was exposed to alcohol and drug abuse from an early age and began abusing both alcohol and marijuana himself before he reached age twelve; (6) petitioner became involved in street gangs and street crime by age twelve; (7) petitioner experienced a lifetime of adversity, disadvantage, and disability; (8) petitioner attended school irregularly and performed poorly in school; and (9) petitioner suffers from impaired cognitive abilities.
Trevino, 678 F.Supp.2d at 467.

.A criminal defendant’s eligibility for the death penalty requires the jury to "convict the defendant of murder and find one ‘aggravating circumstance' (or its equivalent) at either the guilt or penalty phase.” Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 2634-35, 129 L.Ed.2d 750 (1994) (internal citation omitted).

. See also Haynes, 526 F.3d at 195 ("The evidence that was allegedly not presented during Haynes's sentencing deals exclusively with mitigating evidence and this evidence does not show that Haynes was actually innocent of a death-eligible offense.”).